**NATIONAL STEEL AND SHIPBUILDING COMPANY**

v.

The **UNITED STATES.**

No. 1–67.

United States Court of Claims.
Dec. 12, 1969.

Robert M. McLeod, San Francisco, Cal., attorney of record, for plaintiff. Thelen, Marrin, Johnson & Bridges, San Francisco, Cal., of counsel.

Sheldon J. Wolfe, Washington, D. C., with whom was Asst. Atty. Gen., William D. Ruckelshaus, for defendant. Steven L. Cohen, of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

PER CURIAM:

This case was referred to Trial Commissioner David Schwartz with directions to prepare and file his opinion on the issues of plaintiff's motion and defendant's cross-motion for summary judgment under the order of reference and Rule 99(c) [since September 1, 1969,

Rule 166(c)]. The commissioner has done so in an opinion and report filed on January 10, 1969, wherein such facts as are necessary to the opinion are set forth. Defendant filed a request for review by the court and plaintiff urged that the court not adopt Section II of the commissioner's report in which he concludes that the Maritime Subsidy Board acted properly in dismissing its administrative claim grounded on Article 7.(d) of the contract. The case has been submitted to the court on oral argument of counsel and the briefs of the parties.

■ The court agrees that there was no administrative remedy for plaintiff's claim and that the hearing board had no jurisdiction of this breach-of-contract claim. On that basis there is no question that the court can decide all the issues, legal or factual, for itself. The parties having agreed that the case shall be decided on the administrative record, the court can deal with that record without deference to the administrative decision. See Clack v. United States, 395 F.2d 773, 779, 184 Ct.Cl. 40, 49–50 (1968). In any event, the court also agrees that the Federal Maritime Board committed legal errors in failing to apply the proper criteria in determining whether the defendant had employed all reasonable effort and reasonable diligence to supply plaintiff with working plans on the specified dates, and that under the proper legal standards the only possible conclusion is that reached by the trial commissioner.

Since the court agrees with the commissioner's opinion and recommended conclusion, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case together with the foregoing paragraph. Therefore,

plaintiff's motion for summary judgment is granted, on liability alone, defendant's cross-motion is denied and proceedings on damages and on any remaining issues will continue after an interval to afford the parties the opportunity to reach agreement, pursuant to the provisions of Rule 131(c).

## OPINION OF COMMISSIONER

SCHWARTZ, Commissioner:

The cross-motions for summary judgment in this suit for breach of contract raise issues of the reasonableness of the efforts and diligence of the Federal Maritime Board in furnishing plaintiff National Steel and Shipbuilding Corporation ("Nassco") with the working plans for two cargo ships built by plaintiff under a contract.

### I

By contract No. FMB–66, dated February 13, 1958, the Federal Maritime Board ("FMB")[1] let to plaintiff the construction of two single screw cargo vessels for a fixed price of $23,509,000. Another contract of the same date, No. FMB–65, let the building of two identical vessels to another shipyard, New York Shipbuilding Corporation ("New York" or "New York Ship"). Each shipbuilder was a party only to its contract with the FMB. New York Ship is not a party to this case.

The four ships were built for ownership by American Export Lines, Inc. pursuant to a program for the replacement of cargo ships under Title V of the Merchant Marine Act of 1936, as amended, 49 Stat. 1995, as amended, 46 U.S.C. § 1151 et seq. American Export, a party to both contracts, received a construc-

[1]. The Federal Maritime Board, the agency which executed the contract involved and exercised the efforts to supply the plans, will be referred to as the "FMB." It is sometimes in the record called the Maritime Administration, Marad or MA. On the abolition of the FMB in 1961 by Reorganization Plan No. 7 (46 U.S.C. (1964 ed.) p. 8860), the Maritime Subsidy Board in the Department of Commerce succeeded to its functions with re-
spect to the subsidy shipbuilding contracts involved in this case. The administrative hearing of plaintiff's claim under the disputes clause of the instant contract (Article 35, General Provisions, appendix hereto) accordingly took place before the Maritime Subsidy Board as the successor of the FMB. The Maritime Subsidy Board will herein be called the "hearing board."

tion-differential subsidy under Sections 501 and 504 of the Act, 49 Stat. 1995, 1998, as amended, 46 U.S.C. §§ 1151, 1154. It is not a party to this case.

The contract had been advertised as one for four vessels, with notice that the FMB might split the work between two or more bidders and elect to furnish one of them with the necessary working plans. Plaintiff in its bid accordingly provided for a reduction of $720,000 in its bid price in the event the FMB furnished it with the plans. New York Ship's bid provided for a decrease of $10,000 in the same event. The FMB chose to split the contract between the yards, accept plaintiff's reduction in price and furnish it with the working plans. The award of two ships to plaintiff, a new and small shipyard, was made with the approval of The President, in the interest of developing shipyard capacity useful in national defense, pursuant to authority contained in Section 502(f) of the Act, 49 Stat. 1996, as amended, 46 U.S.C. § 1152(f).

Plaintiff performed its contract and delivered its two vessels on contract delivery dates. The controversy concerns increased costs incurred by it, allegedly from the breach by the FMB of its obligation under the contract to employ all reasonable effort and diligence to supply plaintiff with some 650 working plans, for use in the construction of the ships, on dates specified in the contract. These plans were prepared by New York Ship and furnished to the FMB pursuant to New York Ship's contract with the FMB, and then pursuant to the FMB-Nassco contract supplied by the FMB to plaintiff.

Article I of the Special Provisions of the FMB-Nassco contract (appendix hereto) provides that the contractor shall build, complete and deliver the vessels, and adds in parenthesis: "(with the contractor receiving from the Board reproducibles of all working plans, purchase specifications and purchase orders * * *)." Addendum 3 to the specifications, a part of the contract, in its

first paragraph states in plainer language the obligation to furnish Nassco with working plans (appendix hereto):

The Owner and the Board shall furnish approved reproducibles of (1) complete working plans, (2) complete purchase specifications, and (3) complete purchase orders.

Working plans are detailed drawings for use in construction, and the "purchase specifications" and "purchase orders" were the procurement documents and data for equipment which was to be identical in the four ships. The term "working plans" is used in the record and herein to include both the working drawings and the procurement papers.

"Reproducibles," as the word implies, are plans processed so as to be capable of reproduction. "Approved reproducibles" were working plans approved, as was required, by the J. J. Henry Co., design agents for the American Export Lines, and by the FMB, and, in the case of various plans, by agencies with an interest in the particular feature of the vessel, such as the Coast Guard, the Public Health Service, the American Bureau of Shipping and insurers.

Although the agreement by the FMB (and the Owner, whose liability is not raised) to supply working plans to the plaintiff was unqualified, the agreement did not extend to a guarantee that plans would be supplied by specific dates. Rather, the FMB (and not the Owner) agreed, in the Addendum, to exercise all reasonable effort and diligence to supply them on specific dates (appendix hereto):

The Federal Maritime Board shall employ all reasonable effort and reasonable diligence to supply to the Contractor working plans on the dates set forth in the Plan Schedules entitled "Design C3–S–38a Plan Schedules, Hull-Machinery-Electrical, 2 January 1958" which form a part hereof.

The three schedules attached to the contract listed, with dates, each of the some 650 hull, machinery and piping and other working plans to be supplied to

Nassco. Identical schedules were attached to the FMB's contract with New York Ship.

As in the FMB-Nassco contract, New York in its contract with the FMB did not agree to furnish the plans to the FMB by the dates in the attached schedules, or by any other firm dates, but only to "employ all reasonable effort and reasonable diligence" to submit the working plans to the Board and the Owner for approval on the scheduled dates.

Since the dates in the schedules attached to both contracts were identical, under one contract Nassco was entitled to the FMB's efforts to supply approved plans on the same dates as, under the second contract, if all went well, New York would submit the plans for approval. In claiming delays in the plans and insufficient effort by the FMB to supply them on time, however, plaintiff has not contended for the literal dates in the schedules attached to its contract. Plaintiff's claim is based on the scheduled dates, extended by a period of time for approval, which has been agreed by the parties. The FMB's formal procedure under its contract with New York Ship contemplated a time period for approval of 18 days after submission of the plan. In practice, approvals often took much longer, and the parties to this case have agreed that they would allow 70 days or 10 weeks for approval, and thereafter begin the computation of any delay in the supply of the plan. This has been done in the stipulation in the record of the amount of the delay in the supply of some 150 plans whose lateness is claimed to have occasioned increased costs.

The FMB's contracts with the two shipyards created a three-party arrangement in which (except for a Nassco-New York side agreement mentioned below) only the FMB had ties with the other two parties. Under one contract, New York would prepare and supply working plans to the FMB, employ all reasonable effort and diligence to furnish them at the scheduled dates, without ob-

ligation to furnish them at those dates, and build two vessels. Under the other contract, plaintiff Nassco would build two vessels, from working plans to be supplied by the FMB, and the FMB would employ all reasonable effort and diligence to furnish the plans at the scheduled dates, without obligation to furnish them at those dates.

By a side agreement, Nassco paid New York $2,000 for a set of blueprint copies of all the working plans as they were prepared, prior to submission for approval. After approval, a blueprint, amended as might be required in the course of approval, would be put into reproducible form, furnished by New York to the FMB under the New York-FMB contract, and then supplied by the FMB to Nassco under the Nassco-FMB contract.

The arrangement by which neither New York nor the FMB were obligated to furnish plans on specified dates but only to make efforts to do so, of course created the possibility that the plans would be late and the charge made that all reasonable effort and diligence had not been employed. Just this occurred. The working plans were late, and admittedly plaintiff thereby suffered increased costs, claimed to be something over a million dollars. The determination of the amount of damages has been postponed and only liability is now in issue. The major issue is whether the FMB met its obligation to Nassco to employ all reasonable effort and diligence to supply the plans at the scheduled dates. A second issue is whether, if such a breach of this obligation took place, the contract itself gives authority for reimbursement of Nassco's increased costs and thus for administrative relief under the disputes clause in the contract, or whether only breach-of-contract damages may be recovered in a judicial forum.

The issues for decision concern only the contract between the FMB and Nassco. New York Ship's efforts and diligence under the FMB-New York contract are not in issue, except as they bear on

whether the FMB met its obligation of effort and diligence to Nassco under the FMB-Nassco contract. As noted, New York is not a party to the case, no question of its liability is involved, and no third-party claims have been raised.

Plaintiff has brought an administrative proceeding for reimbursement of its increased costs, under a customary disputes clause in the contract (Article 35, General Provisions, appendix hereto), before the Maritime Subsidy Board, the successor of the Federal Maritime Board in regard to the contract involved. The hearing was limited to liability alone, with the expectation that if the claimed liability were upheld, litigation of damages could be avoided by agreement of the parties. Plaintiff's theory was that Article 7(d) of the General Provisions of the contract (appendix hereto) authorizes administrative reimbursement of the amount of the increase in its costs caused by the failure of the FMB to exercise sufficient effort to supply the plans on time. The hearing board, in circumstances to be detailed below, also considered plaintiff's claim of breach of contract by the FMB.

On the rejection of both the dispute and breach of contract aspects of the claim, by a hearing officer whose determination was approved by the hearing board, plaintiff filed suit in this court for review and reversal of the administrative decision in accordance with the standards of the Wunderlich Act, 41 U.S.C. §§ 321, 322, and, alternatively, for damages of $1,050,598 for breach of contract by the failure of the FMB to employ the efforts required by the contract. The parties have filed cross-motions for summary judgment. The record is by agreement to be that made before the hearing board and, since no evidence was taken on damages, plaintiff's motion is necessarily one for partial summary judgment, on liability alone.

The motions raise, first, the question whether Article 7(d) of the contract authorizes administrative relief for such a claim as plaintiff made and, second, the merits of the claim for breach of contract. On the first question, it is my opinion, in concurrence with the administrative decision, that Article 7(d) is not available to plaintiff and thus that no administrative claim lies. On the breach of contract claim, it is my opinion that the claim is open to review in this court and that it has merit. The record of the efforts of the FMB to supply the plans on time shows substantial, even inexplicable, deficiencies in reasonable effort and reasonable diligence. Plaintiff is entitled to partial summary judgment, on liability. After an interval of time to permit the parties to reach agreement, proceedings should go forward on the remaining issues of damages.

## II

### The Claim to Reimbursement of Costs Under Article 7(d) of the Contract

Plaintiff's administrative claim was based on Article 7(d) of the contract, which provides for reimbursement to the contractor of the costs to him of late delivery of government-furnished "material." The second sentence of Article 7(d) (appendix hereto) provides that "the Board shall pay to the Contractor the costs to the Contractor * * * resulting from delay in delivery of * * item[s] of material, furnished by * * the Board beyond the time the Contractor would have secured the delivery of said item to the shipyard if it had been furnished by the Contractor * * *." Plaintiff contends that this article gave authority for administrative reimbursement of its increased costs, under the disputes clause of the contract, from a breach by the FMB of the duty under Addendum 3 to make all reasonable and diligent efforts to supply the plans on time.

The contracting officer, to whom a claim for an adjustment under the disputes clause is first presented, denied the claim on the ground that reproducibles of working plans are not "material" within Article 7(d) and thus that the ar-

ticle is no authority for the claimed reimbursement. Plaintiff's appeal from this decision was denied by the hearing officer who acted for the hearing board, and the denial was thereafter confirmed by the hearing board. The ground of the hearing officer's decision was that Addendum 3, drawn specially for the subject of working plans, alone governs the supply of working plans, the required efforts to supply and damages from a deficiency in effort. The decision, it may be noted, is one of a question of law, and is therefore not final or binding in this court under the disputes clause and the Wunderlich Act.

In my opinion, the decision was correct and I concur in it on the grounds given by both the hearing officer and the contracting officer for their decisions.

*Working Plans as "Material."* Article 7 (appendix hereto) is a version, some years old, of the familiar government-furnished material clause. The "materials" to which the article applies are limited to those of a tangible nature to be incorporated or installed into the end product, and therefore do not include the "approved reproducibles of (1) complete working plans, (2) complete purchase specifications and (3) complete purchase orders" to be supplied under the instant contract.

"Material," as used in the contract, is defined in Article 2(g) of the contract's General Provisions (appendix hereto) as follows:

The term "material" includes but is not limited to any raw, in process or manufactured machinery, equipment, component, accessory, part, assembly or product of any kind which will be a direct material cost charge to the contract work.

Working plans are not understood to be a "component," "accessory" or other "part" of the product, which would be a "direct material cost charge" to the contract work. All the illustrations given in Article 2(g), though illustrations only, are physical things incorporated into the end product, and exclude information

material such as a working plan, a purchase order or a purchase specification. Addendum 3 (appendix hereto) uses the term "materials" in its sense of physical things; it describes as "materials" some fifty components of the vessels, such as the propeller, turbines, lifeboats, generators and galley equipment. For the lesser breadth of "material" as compared to the broader word "property," more recently used, compare ASPR 13.101–1, 32 CFR 13.101–1 (government property) with ASPR 13.101–4, 32 CFR 13.101–4 ("material").

 *Exclusiveness of Addendum 3.* An alternative ground for rejection of Article 7(d) as authority for an administrative adjustment is that Addendum 3 is exclusive in governing all aspects of the supply of working plans. The Addendum was specially drafted for the problem of supply of working plans and the possible delay in their supply: Because of its specificity and differences from Article 7(d), the Addendum alone controls the consequences of a failure to employ the required effort and diligence to furnish the working plans on the scheduled dates.

Article 7(d) is phrased in terms of delay in delivery of a material and comtemplates the failure to keep an unqualified promise to bring about a future event—the delivery of a material by a specific date. Such a promise, a classic contract, is unaffected by the degree of power the promisor possesses over the event, or the degree of effort he may make to bring it to pass. The failure to deliver on time, without more, is a breach. In negotiating the instant contract the FMB deliberately did not wish to promise to bring about the event—the supply of plans—by a specific date. The Addendum, therefore, promised that the FMB would employ described effort and diligence to supply the plans by specified dates.

The first difference between Article 7 (d) and the Addendum is thus one in the nature and proof of a breach. In the

former, the subject is delivery of a thing on time and its failure to arrive on time; in the latter it is the making, deficiency and failure of effort to supply a thing on time. Proof of the date would be sufficient under Article 7(d). The Addendum requires proof of a deficiency in the reasonableness of efforts made to supply. Non-arrival and the duration of delay might bear on damages, but breach consists of no more than the failure to make the required efforts.

Under Article 7(d) the first step in the determination of damages would be the determination of days of delay, a simple difference between the promised day and the day of delivery. Two deductions would then be made: first, the days of delay the contractor would have experienced had he himself furnished the thing (to provide, for instance, for a cause of delay equally affecting all suppliers), and second, there would be deducted any delay by reason of the causes, deemed to be beyond control, specified in Article 7(d) by its incorporation of Article 5 of the General Provisions (appendix hereto). The increased costs to the contractor and any other damages caused by the delay, so computed, would then be determined. Damages for breach of the Addendum, on the other hand, are left entirely to the common law. Without regard to such precise rules as are set out in Article 7(d), the trier of the facts would weigh the causes of the delay, the degree to which the efforts were deficient, the effect of proper efforts, the duration of the delay, the increased costs and any other relevant facts.

These differences preclude the application of Article 7(d) to the claim of breach under the Addendum. Only the Addendum controls such a breach.

Accordingly, it is my opinion that on both the foregoing grounds the hearing board acted properly in dismissing the administrative claim insofar as it was grounded on Article 7(d).

## III

*Administrative Jurisdiction of the Claim of Breach of Addendum 3 and Review in this Court of the Decision on Breach*

Article 7(d) was the only clause in the contract which was or could have been invoked in support of administrative relief under the disputes clause. Without Article 7(d), the claim of breach of duty of Addendum 3 is a pure breach of contract claim over which the administrative authorities had no jurisdiction. The administrative decision on the breach of contract claim was thus beyond the hearing board's jurisdiction, and by that token not entitled to any final or binding effect in this court under the Wunderlich Act, 41 U.S.C. §§ 321, 322. Review of the decision, here, is in any event not foreclosed, for it was a decision of law, not of fact. Under the Act, only decisions of questions of fact are entitled to finality in suits thereafter filed.

*The Absence of Disputes Clause Jurisdiction.* It appears from the record that the hearing officer passed on the claim for breach of contract in the course of an inquiry, specially requested by the agency, into the desirability of voluntary settlement of Nassco's claim for breach of contract.

Consideration of settlement was initiated by the agency. The contracting officer invited plaintiff to present, with its administrative claim for an adjustment under Article 7(d), a claim addressed to the board's power to make disbursements in payment of settlements and compromises. The claim for breach of contract was submitted in response to this invitation. Apparently in recognition of his lack of disputes-clause jurisdiction of the contract claim, when the officer denied both the claim under Article 7(d) and the claim of breach of contract, he explicitly allowed an appeal under, and limited by, the disputes clause alone. Thus only the Article 7(d) claim came to the board by the notice of appeal. The Maritime Subsidy Board

thereafter made a formal written direction to its hearing officer that he consider and report on both the Article 7(d) claim and the breach of contract claim, the latter presumably for the same reason it had been considered by the contracting officer, for purposes of voluntary settlement.

Article 7(d) was the only clause claimed to authorize the grant of administrative relief, that is, to create a dispute under the contract. The administrative decision that Article 7(d) gave no authority for an administrative adjustment of the claim was thus a holding that the hearing board had no jurisdiction, and the holding exhausted its jurisdiction. The board's further consideration of the breach of contract claim, for purposes of settlement or otherwise, while entirely proper in the sense of propriety and duty, was consideration of a matter—a pure breach of contract claim—over which the parties in their contract had given the administrative authorities no jurisdiction. This is the doctrine of *Grace* and *Utah*, recently restated by this court in Jefferson Constr. Co. v. United States, 392 F.2d 1006, 1010–1011, 183 Ct.Cl. 720, 725, 727 (1968). United States v. Anthony Grace & Sons, Inc., 384 U.S. 424, 86 S.Ct. 1539, 16 L.Ed.2d 662 (1966); United States v. Utah Constr. & Mining Co., 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966).

In *Jefferson Constr. Co.,* the court pointed out "the distinction between claims which, by virtue of an agreement by the parties (as embodied in their contract), are determinable by an administrative agency, and those claims which, because they have not been made subject to resolution under the contract, remain 'pure' breach of contract claims to be tried before the court." The court held that "A true breach of contract claim *which, by definition is outside the scope* of the contract, is subject neither to equitable adjustment under the contract nor to administrative review or resolution." 392 F.2d at 1010, 183 Ct.Cl. at 725.

■ Since neither Article 7(d) claim nor breach of contract claim was within the board's jurisdiction, any findings made on either branch of the case could have no finality. "Of course, if the findings made by the Board are not relevant to a dispute over which it has jurisdiction, such findings would have no finality whatsoever." United States v. Utah Constr. & Mining Co., *supra,* 384 U.S. at 419, n. 15, 86 S.Ct. at 1558.

Neither the administrative authorities nor the claimant thought otherwise than that the questions involved in the breach of contract claim would be open to review in any judicial proceedings. As the board hearing began, the hearing officer noted that he did not have jurisdiction to consider the breach of contract claim, except by reason of the board's special direction. And counsel for the claimant had in submitting the claim for breach of contract to the contracting officer, on March 9, 1964, stated that "the claim submitted herewith for administrative consideration is without prejudice to our right to claim and recover our total excess costs or damages as may be proved and to such other relief at law or equity as we may be entitled."

■ The government suggests that plaintiff has in a statement in the course of pretrial proceedings in this court relinquished elements of *its* claim for breach of contract and limited itself to administrative relief. The pretrial statement in question, concurred in by the government, set out plaintiff's position "that proceedings herein should be by way of review of the administrative record pursuant to the standards prescribed by the Wunderlich Act, 41 U.S.C. §§ 321–322." The statement was filed pursuant to an order of the trial commissioner, entered immediately on the effective date of the court's new rules for review of Wunderlich Act cases, that the parties file the equivalent of the statement required by Rule 95(a) (since September 1, 1969, Rule 162(a)) to be contained in petitions thenceforth to be filed.

The statement was accordingly a consent that the issues involved in liability should be decided on the written administrative record, pursuant to the standards of the Wunderlich Act as they might be applicable, and not by trial de novo. On the concurrence of the government, the statement became an agreement to this effect, performed by the parties on their filing of cross-motions for summary judgment on the administrative record.

The foregoing function of the pretrial statement cannot be stretched into a knowing waiver of elements of the subtantive claim of breach or of the claim to a judicial hearing, especially in view of the early date of the statement in relation to general understanding by the bar of the applications of Rule 95(a) (since September 1, 1969, Rule 162(a)) and of the chapter of the Rules of which it was part, Chapter XVIII, "Wunderlich Act Reviews." Plaintiff in its 1964 statement to the contracting officer had explicitly reserved all its rights to a judicial remedy for breach of contract, and it has emphasized those rights, distinguishing them from its claim to administrative relief, in this court, in the petition, motion and supporting briefs.

■ *The Decision a Decision of Law.* The administrative decision against the breach of contract claim is not final, and is reviewable here, for the additional reason that it was a decision of a question of law, always open to judicial review. The hearing officer in his opinion noted that the controversy was not a dispute over the facts but rather a matter of the inferences to be drawn from facts contained in the written exhibits in the record. Accordingly, he did not make any of the findings of fact proposed by agency counsel, setting out the visits, letters and other details of the efforts made by the FMB to supply the working plans on time. These would have been findings of "simple facts," entitled to final effect in a proceeding within the board's jurisdiction. Perini Corp. v. United States, 381 F.2d 403, 409, 180

Ct.Cl. 768, 777 (1967). The board made only an ultimate decision that plaintiff's increased costs resulted from its own assumption of the risk of delay and not from any failure of efforts by the FMB to supply it with the plans on time.

Several elements of the decision are of such significance as make the result one all-embracing decision of law on the construction and interpretation of the contract clause providing for "all reasonable effort and reasonable diligence." For instance, the FMB was held to have done all that it could to hasten delivery of the plans, though it admittedly made no efforts to seek another or a supplemental source of plans, as the delays in New York's deliveries of plans increased. At first glance, the rejection of the fact of this omission as militating against the conclusion that everything possible was done, is a decision of a question of fact. Yet the FMB's omission to seek another source of plans (discussed in Part VI of this opinion) may constitute a failure to make an effort indispensable for the decision of law that the FMB performed the duty required of it by the contract.

Other such "facts" of comparable import to the result were the circumstances on which the hearing board rested its conclusion that plaintiff had assumed the risk: the foreseeability by plaintiff that the demands of New York's other work would delay production of the plans; friction "inherent" in the relationship of the two yards, under which New York began construction later than plaintiff, and yet was required immediately to begin production for plaintiff's use of plans not needed for its own construction; and, finally, the "total contractual arrangement" between the FMB, plaintiff and New York Ship, of which plaintiff was held to have notice. The total arrangement, the administrative opinion reasons, put plaintiff in a position with respect to plans "subordinate" to and at the "mercy" of New York, busy with other work and "obviously nettled at having been compelled to divide the four-ship contract for which it had been de-

clared the low bidder, with a West Coast rival," the plaintiff.

The gathering of these facts in support of the conclusion that plaintiff had assumed the risk of delay was necessarily a tacit rejection of them as circumstances affecting and heightening the duty of the FMB to employ effort and diligence. Details are postponed to the discussion of the merits of the claim of breach. Here it is sufficient to point out that the rejection of some and the selection of other facts to put in the balance was in essence a judgment of law on the nature of the duty to employ all reasonable effort and reasonable diligence to achieve a precise objective.

Historically the term "question of law" grew up as a short way of describing questions, of interpretation of contracts and others, which should be decided by a judge or court and not by a jury or an administrative agency. See Martin Wunderlich Co. v. United States, 117 Ct. Cl. 92, 212–213 (1950), reversed 342 U.S. 98, 72 S.Ct. 154, 96 L.Ed. 113 (1951). The significance in this case of the choice and rejection of facts, in the administrative decision, provides proof once again that questions of fact have meaning only in their legal context, and that questions of fact and questions of law are not mutually exclusive but are at opposite ends of a scale whose points ascend imperceptibly from fact to law and back again. See River Constr. Corp. v. United States, 159 Ct.Cl. 254, 262–263 (1962); Dickinson, Administrative Justice and the Supremacy of Law in the United States 55 (1927).

Difficult as it may be to define the difference between questions of law and of fact, this court has often been called upon to allot cases to one side or the other of the line to be drawn in determining the quality of administrative decisions under the Wunderlich Act. By those judgments, the instant case falls on the side of the decisions open to judicial review as interpretations of contract language or as establishing criteria for the application of contract standards.

Questions comparable to that in the instant case which have been held reviewable as questions of law are these: finding of a "changed condition" by reason of a substantial variation in the quantity of a unit-price item estimated in the contract (Perini Corp. v. United States, 381 F.2d 403, 409, 180 Ct.Cl. 768, 777–778 788 (1967)); the manner of computation of an 18-month period specified in a contract and whether mailing or receipt is "issuance" under the contract terms (Dynamics Corp. of America v. United States, 389 F.2d 424, 429, 182 Ct.Cl. 62, 71–72 (1968)); the correct method of accounting to determine "total contract costs" and other types of costs referred to in a contract (Lockheed Aircraft Corp. v. United States, 375 F.2d 786, 790, 179 Ct.Cl. 545, 552–553 (1967)); and whether an endurance test required by the contract should measure the speed of one roller or another of a dynamometer (Maxwell Dynamometer Co. v. United States, 386 F.2d 855, 867, 181 Ct.Cl. 607, 626 (1967)).

## IV

### The Contract Standard for the Efforts To Be Made to Supply the Plans

I turn to the question, wholly open to fresh consideration in this court, whether the Federal Maritime Board performed its obligation under Addendum 3 to the Specifications of the contract to "employ all reasonable effort and reasonable diligence to supply to the Contractor working plans on the dates set forth in the Plan Schedules" attached to the contract.

*The Definition of the Contract Duty.* "All," "reasonable," "effort" and "diligence," the words of the contract duty claimed to have been violated, are words with a long history of legal use and meaning.

"Effort" is defined in a lawyer's encyclopedia as meaning "exertion, * * laborious attempts, or strenuous endeavors; struggle directed to the accomplish-

ment of an object."[2] Those who were graded on their effort in early schooling know that to be acceptable effort must be constant, not intermittent or irregular. If there were any doubt, the additional duty of "diligence" confirms that the effort contemplated by the contract must be constant. The legal dictionary defines "diligence" as "prudence; vigilant activity; attentiveness; or care,"[3] and "diligent" as "[a]ttentive and persistent in doing a thing; steadily applied; active; sedulous; laborious; unremitting; untiring."[4] Another such authority adds that "diligent" also means "exhibiting careful and persevering effort to accomplish what is undertaken; exhibiting the same degree of care and prudence that men prompted by self-interest generally exercise in their own affairs."[5]

The obligation of the FMB to employ "effort" and "diligence" thus required strenuous exertions and endeavors, vigilantly, steadily and perseveringly undertaken and directed to the objective of the supply of the plans at the scheduled times.

◼ The effort and diligence were, further, to be "all" effort and diligence. "All" is often used in writing intended to have legal effect as a preface to flexible or imprecise words, as in "all other property," "all the rest and residue," "all and every," "all speed," "all respect." Its purpose is to underscore that intended breadth is not to be narrowed. "All" means the whole of that which it defines —not less than the entirety[6] "All" means all and not substantially all.[7] The prefatory word "all" in the contract clause meant, then, that no available effort might be omitted.

◼ Lastly, the contract provided that the "all" "effort" and "diligence" were

2. 28 C.J.S. Effort p. 841. *Effort* is also synonymous with "essay," "strain," "struggle" and "trial." 28 C.J.S. Effort, Supp.1969 at 161. Compare the definitions in the dictionaries of English:
"effort 1a: conscious exertion of physical or mental power * * * b: expenditure of energy toward a particular end; forceful attempt * * * c: hard work * * * 2: the product or result of expenditure of energy—used esp. of a literary or artistic creation * * * 3a: active or effective force * * *." Webster's Third New International Dictionary 725 (1966).
"effort. 1. deliberate exertion of physical or mental power * * * 2. a strenuous attempt * * * Syn. 1. struggle, striving * * *." Random House Dictionary of the English Language 455 (1966).

3. Black, Law Dictionary 544 (4th rev. ed. 1968)

4. *Id.* at p. 545.

5. 26A C.J.S. Diligent p. 947. Webster's defines "diligence" as "persevering application; * * * devoted and painstaking application to accomplish an undertaking; assiduity"; and as "the attention and care required of a person (as a party to a contract) * * * opposed to *negligence*." "Diligent" is defined as "characterized by steady, earnest, attentive, and energetic application and

effort in a pursuit, vocation, or study: not lackadaisical." Webster's Third New International Dictionary, *supra*, 633.

6. "All. Means the whole of—used with a singular noun or pronoun, and referring to amount, quantity, extent, duration, quality, or degree." Black, Law Dictionary, *supra*, 98.
"All 1a: that is the whole amount of quantity of * * * b: as much as possible; the greatest possible * * * 2a: every member or individual component of: each one of * * * 3: the whole number of sum of * * * 4: Every * * * 5: any whatever * * * 6: nothing but * * *." Webster's Third New International Dictionary, *supra*, 54.

7. Addison v. Holly Hill Fruit Products, Inc., 32 U.S. 607, 610–611, 64 S.Ct. 1215, 88 L.Ed. 1488 (1944) (regulation exempting one who procures all his products from a certain area means, literally, all products). Compare Brotherhood of Railroad Trainmen, Enterprise Lodge No. 27 v. Toledo P. & W. R.R., 321 U.S. 50, 55–62, 64 S.Ct. 413, 88 L.Ed. 534 (1944) (the "every reasonable effort" to settle a labor dispute required by the Norris-La Guardia Act (47 Stat. 72, 29 U.S.C. § 108) before a complainant may seek an injunction is not made by a plaintiff who has resorted to less than all of the possible methods of conciliation).

to be "reasonable." The great function in the law of the word "reasonable" is to enable a standard of decision to be accommodated to all circumstances. "Reasonable," used for this purpose, has served in legal instruments at least since Magna Carta, in which King John undertook not to levy "more than a reasonable aid" or tax to raise a ransom for his person.[8] The standard of reasonableness has since become the mainstay or our law. We could not do without the "reasonable man" and the "reasonable care" he exercises, or the "reasonable doubt" of the juror.

"Reasonable" in the instant contract means just what it meant in Magna Carta—that which is proper, fair, equitable and honest in the judgment of a "reasonable" man, and is suitable and appropriate to the end in view in the light of the facts and circumstances.[9]

This meaning is given in the variety of cases in which this court has passed on the reasonableness of the government's effort and diligence in performing a duty, usually implied from other provisions of the contract to supply materials to a contractor or to refrain from hindering him in his performance. Reasonable effort and diligence is held to require good faith,[10] consideration of the interests of the contractor [11] and freedom from fault or negligence [12] in making the efforts appropriate in the circumstances. Even without the presence of such a word as "all," reasonable effort and diligence is found only where the government has made all the efforts it could have been expected to make. The standard is held met when it appears that the government showed "great diligence" and "did all that it could to prevent costly delays to plaintiffs," [13] used

8. Magna Carta, 1215, chap. 12, Vorst (ed.), Great Documents of Western Civilization 112 (1967).

9. Ben C. Gerwick, Inc. v. United States, 285 F.2d 432, 437, 152 Ct.Cl. 69, 77–78 (1961); 75 C.J.S. Reasonable p. 635; Black, Law Dictionary, *supra*, 1431.
 "The word 'reasonable' connotes action according to the dictates of reason, such as is just, fair and suitable in the circumstances. When employed to describe the means which are used to achieve a legitimate end it suggests not necessarily the best or only method, but one fairly appropriate, at least under all the circumstances, and when used in connection with legislative measures it signifies such measures as are fit and appropriate to the end in view. It has been said that conduct is reasonable if it is consistent with that of the prudent man in like circumstances." 75 C.J.S. Reasonable p. 635.
 "Reasonable. Just; proper. Ordinary or usual. Fit and appropriate to the end in view. Parkes v. Bartlett, 236 Mich., 460, 210 N.W. 492, 494, 47 A.L.R. 1128; Having the faculty of reason; rational; governed by reason; under the influence of reason; agreeable to reason. Claussen v. State, 21 Wyo. 505, 133 p. 1055, 1056 [135 p. 802]. Thinking, speaking, or acting according to the dictates of reason; not immoderate or excessive,

being synonymous with rational; honest; equitable; fair; suitable; moderate; tolerable. Cass v. States [State] 124 Tex.Cr.R. 208, 61 S.W.2d 500." Black, Law Dictionary, *supra*, 1431.

10. L. L. Hall Constr. Co. v. United States, 379 F.2d 559, 564, 177 Ct.Cl. 870, 880 (1966); United States v. Howard P. Foley Co., 329 U.S. 64, 66–67, 67 S.Ct. 154, 91 L.Ed. 44 (1946).

11. Ozark Dam Constructors v. United States, 127 F.Supp. 187, 191, 130 Ct.Cl. 354, 360 (1955); Peter Kiewit Sons' Co. v. United States, 151 F.Supp. 726, 730–731, 138 Ct.Cl. 668, 673–675 (1957); cf. Volentine & Littleton v. United States, 169 F.Supp. 263, 265, 144 Ct.Cl. 723, 725–726 (1959); William A. Smith Contracting Co. v. United States, 292 F.2d 847, 852, 155 Ct.Cl. 1, 10 (1961).

12. Peter Kiewit Sons' Co. v. United States, *supra*, n. 11; Thompson v. United States, 124 F.Supp. 645, 649–650, 130 Ct.Cl. 1, 7–9 (1954); Ben C. Gerwick, Inc. v. United States, *supra*, n. 9; Chalender v. United States, 119 F.Supp. 186, 190, 127 Ct.Cl. 557, 563–564 (1954); Barling v. United States, 111 F.Supp. 878, 880, 126 Ct.Cl. 34, 38–39 (1953).

13. Barling v. United States, *supra*, n. 12.

"novel methods to assure expedition" and acted with great, if not unusual diligence" [14] or "exerted every effort" and was "more than ordinarily diligent." [15] The failure to make efforts capable of being made prevents a finding that all reasonable effort has been made.[16]

*The Delays in the Supply of the Plans.* The circumstances of first importance for judging the reasonableness of the efforts and diligence to be employed in this case were the delays which took place in the production of the plans by New York Ship.

The delays were admittedly substantial. Some 650 plans were to be supplied at scheduled dates during an 18-month period, from March 1958 to September 1959. The first plans were supplied in July 1958, four months late. The last plans, alterations to plans already furnished, came in October of 1960. Numbers of plans were over a year late. The average delay of all plans (computed after the agreed allowance of 10 weeks for necessary approvals) was 147 days or almost five months.

*Illustrations of Delay—the Kingposts.* The working plans for the kingpost (the columns supporting the tackle and booms used for cargo handling) and cargo handling detail were scheduled to be supplied in December, 1958 and January, 1959; later, in August, 1959 and still later in October, 1959. The plans came in January and February of 1960, too late for fabrication and installation in the two hulls prior to launching, though launching already had been delayed to January and June of 1960. Had they been installed prior to launching, they would have helped avoid any failure of the girders of the hull from the stress of launching; their absence at launching required the substitution of temporary supports.

*Out-of-sequence and delayed plans— the machinery foundations.* Plans for the machinery foundations, the lowest level of a ship, were required early, some as soon as May, 1958. Of the 33 machinery foundation plans in the stipulation, one was 59 days late; four, between 100 and 150 days late; 14, between 150 and 200 days late; 6, between 200 and 300 days late; and eight, between 300 and 363 days late.

They were also not supplied in their needed sequence; the earliest needed seemed to come latest. The two plans due earliest, in May, 1958, came in March of 1959, each over 290 days late. All those over 300 days late were among those needed in the first half of the need periods. In consequence, the foundations, which should have been installed before the forced draft blowers were put in place, were fabricated and put into place only after the blowers had been placed nearly where they would eventually be. Once the blowers were in, the foundations had to be put into place by physical means rather than lifted into place by crane. The blowers, in turn, had to be moved to their precise place by similar crude methods.

*Effect on the Construction Schedule.* Delay in the supply of plans was a primary cause of repeated postponements in Nassco's schedule of "principal events" —keel-laying and launching—in the construction of its vessels. Completion of the first vessel was scheduled for May, 1960. It was completed seven months later, on December 30, 1960, less than two weeks before the contract delivery date on January 10, 1961. The second vessel, scheduled to be completed in September, 1960, was completed six months later, on April 3, 1961, days before the contract delivery date of April 5, 1961. New York Ship, though it began construction almost a year later than Nassco

---

14. Howard P. Foley Co. v. United States, 63 F.Supp. 209, 215, 105 Ct.Cl. 161, 172 (1945), reversed on other grounds, United States v. Howard P. Foley Co., *supra*, n. 10.

15. Otis Williams & Co. v. United States, 120 Ct.Cl. 249, 258, 273–274 (1951).

16. Thompson v. United States, *supra*, n. 12.

and for that period had no need for its plans, nevertheless was so delayed in its construction by its own delays in completing plans that it missed the contract delivery date of its first vessel by several weeks.

*Causes.* FMB personnel believed that the root cause of the delays in plans was the differing construction schedules of the two yards. The hearing officer essentially agreed, ascribing the delays to the "total contractual arrangement" and to the position in which it placed Nassco with respect to plans. The government as defendant in this case has not taken a clear position on the causes of the delay in production of the plans.

*Causes—New York's Other Work.* The cause of the delays offered by New York at the time (no representatives of New York testified at the hearing) was the demands on its draftsmen of other ship construction work of higher priority. One of New York's drafting sections, the piping section, was particularly affected throughout the plan-producing period.

*Causes—Errors, Alterations and Interferences.* More subtle yet constant delays resulted from errors in the plans drawn by New York.

The contract provided that FMB did not guarantee the accuracy of the plans. There is a question, however, whether the errors warranted efforts by the FMB, as the equivalent of delays, on the ground that in the long period in which Nassco was in construction and New York was not, and perhaps thereafter, New York was pressed by its other work into submitting for approval plans not fully checked and containing excessive errors.

*Errors and delay.* The simplest type of delay from an erroneous plan was the postponement of approval and the consequent inability of the FMB to supply a reproducible working plan (by definition an approved plan). At one point, in January, 1959, more than half the plans submitted were being disapproved. Disapprovals were so frequent that the phrase "first submittal" came to be used. Delayed approvals often forced Nassco to begin work on the basis of a blueprint of the plan as submitted for approval. When an error in the drawing as submitted led to its disapproval and amendment, the approved reproducible might, on its arrival, require redoing of some or all of the work already redone.

Causes of delay could interact. An error in a plan might lead to its disapproval and return to the drawing board, where it might wait indefinitely if the engineers were busy with higher priority work.

*Alterations and delay.* Approval did not catch all errors. An error or incompletness not detected in the approval process would thereafter be corrected by an "alteration." Many of the plans were altered. Of the 146 plans whose lateness was the subject of stipulation, 94 were altered at least once. Notice of an impending alteration often came in a blueprint, when work was in process on the basis of the reproducible earlier supplied. Work already done on the basis of a reproducible repeatedly had to be redone. The alteration might not be approved as submitted; the reproducible of the plan as altered might arrive in a still different form. On receipt of a blueprint of an alteration at variance with work already done, Nassco's choice lay between different types of delay. Work either had to be halted until the arrival of the approved reproducible, or the work to date redone and then continued in accordance with the blueprint, in the expectation that the blueprint would be approved.

Delay could be increased by successive alterations. More than one alteration was common; in many cases there were three and four. One exhibit mentions an alteration K, an eleventh alteration.

The interval between the supply of what came to be called the first reproducible and the last alteration (not the total time between scheduled date of supply and last alteration) ranged up to 17 months. The average for the 94 altered

plans listed in the stipulation was eight months. Three of the last alterations furnished last of all, in October of 1960, were plans of which the first reproducible had been supplied over a year before, two of them only 10 days late and one 15 days ahead of the scheduled date.

*Delay from Interferences.* Delays were caused also by interferences, that is, a non-correspondence between plans as, for example, a plan showing a beam at head-height in a passageway called for by another plan.

Nassco complained that New York's plans had never been sufficiently checked for interferences and that the errors and interferences and the rework and confusion caused thereby were such that it had been compelled to add seven engineers to those it had originally hired for the job of screening New York's drawings. Nassco felt that having reduced its bid by $720,000 on condition that it receive and not furnish the working plans, it was entitled to plans reasonably free from errors, despite the contract provision that the correctness of plans was not guaranteed. In the case of midship-house piping, ventilation and electrical plans, interference was coupled with out-of-sequence supply to produce acute delay well along in construction.

The installation of midship-house piping, ventilation and electrical systems required six types of working plans—plumbing, ventilation, wireways, firemains, sanitation and heating. The six were to be separately installed, in the order named, on seven levels and decks from the machinery level going upward through each deck from Second to Bridge, and they were scheduled in this sequence, in the contract plan schedules. Neither systems nor levels were supplied in the right sequence. The six systems for the machinery level came in the order of 1, 5, 4, 2, 6, 3; for the second deck, in in the order of 1, 6, 4, 2, 5, 3; for the main deck, in the order of 3, 4, 1, 2, 6, 5, and so on. For the second deck, the first, third, fourth and sixth systems came in August, 1959, the fifth in November, 1959, and the ventilation drawings, need-ed second, came last in March of 1960. For the main deck, the first, third and fourth systems came in 1959; the second, fifth and sixth in 1960.

All the wireways plans for the seven decks and levels came in August and September of 1959. Fourteen sets of plans for plumbing and ventilation were needed earlier; only two came earlier. The twelve that came later arrived on dates between October, 1959 and March, 1960. Plumbing, needed first, came fifth for the boat deck and last for the cabin and bridge decks, preventing much of the out-of-sequence installation attempted as an accommodation to the facts of the receipt of plans.

Installation in the correct sequence was of course impossible. To get work done, in the absence of plumbing and ventilation plans, the wireways were installed when plans were received in 1959. When ventilation drawings came, severe interference was discovered with wireways and firemains, and all work on ventilation, piping and wiring was stopped for six weeks while Nassco made the composite drawings for each deck level necessary to correct the contradictions. The wireways system, substantially completed, had to be torn out and redone because of the interferences. Nassco claimed that the designer had neither oriented the drawings to the ship nor checked them for interferences.

In turning to the efforts made to supply the plans on time, it is appropriate to point out that the contract imposed no liability for delay, no matter how great. The FMB's single obligation was to employ "all reasonable effort and reasonable diligence" to supply the plans on the scheduled dates.

## V

*Chronological Review of the Efforts Made by the FMB to Supply the Plans by the Scheduled Dates*

1. *From the Delay in the First Due Plans to the Appointment of a Project Expediter in September 1958.*

*The First Complaints, June, 1958.* The first working plans due, purchase

orders and purchase requisitions for equipment to be identical in the four ships, were scheduled for receipt soon after the execution of the contract in February, 1958; they were delayed and in the Spring Nassco hired an engineer, W. A. Schlosser, and stationed him at New York's yard in Camden, N. J., to expedite the plans on its behalf.

About 50 plans were due by June 4, and none had been received. On that day, Walter H. Beattie, the FMB Construction Representative stationed at Nassco's yard in San Diego, in the first of his over twenty numbered narrative reports in the record, advised that no requisitions or purchase orders had been received, and that the delay in furnishing the requisition schedule was affecting the placement of steel orders. He had learned this on inquiring as to "potential delays which are apparent at this time." J. E. Watson, an FMB Washington scheduling expediter, noted, after a visit to San Diego on June 19, that "potential problems" existed in respect of "receipt of bills of material, purchase specifications and working drawings." On June 30, Beattie reported that none of the plans he had asked for on June 4 had been received; further, that the contractor had commenced preparations for laying out the first vessels mid-body lines in the mold loft but had not received reproducibles for the work.

On July 7, Nassco wrote to the FMB's contracting officer, L. C. Hoffman, Chief of the Bureau of Ship Construction of the Maritime Administration. Not one plan had been received. The letter complained of the failure to receive the steel ordering list and bill of material and reproducibles of purchase orders for turbines, boilers and other major equipment. Referring to the FMB's obligation of effort and diligence to supply the working plans on the dates in the contract schedules, Nassco said that "these dates are not being met" and that if the FMB did not take prompt action, the dates for the early principal events in the construction schedule (keel-laying and launching) would not be met and it would be compelled to compress its construction schedule. Early receipt of mold loft offsets and mid-body lines plans was said to be "imperative" if Nassco were to meet its schedule.

At that time, according to plaintiff's administrative claim, about 60 plans were scheduled for receipt; according to plaintiff's letter of July 7, 50 blueprints had been received, indicating that that number had been submitted for approval.

*The FMB's Expedition Efforts in July 1958.* On receipt of Nassco's complaint of July 7, the FMB made inquiries at New York Ship. Some purchase orders had been placed; others were behind schedule and the mold loft drawings were not ready. Hoffman wrote Nassco, in a letter dictated by Watson, that the remaining purchase orders "should be placed soon" and that the mold loft drawings "and others" are "being expedited."

Some reproducibles were apparently ready. On July 14, New York wrote to the FMB that it had received no reply to its inquiry to the FMB in May as to what type of reproducibles were desired and that it was now sending the ready reproducibles under separate cover. They were not, however, actually dispatched until July 22. The FMB forwarded them to Nassco on July 23. They were the first to be supplied to Nassco and were said to include the "early required working plans, except Mold Loft Offsets." The first of the mold loft offsets were mailed July 31.

New York Ship would not agree to Hoffman's request that it send reproducibles directly to Nassco in San Diego. New York maintained, according to a memo by Watson, that "it is not (its) intention to be difficult" but it held to its position from the time of the execution of the contract that it "did not want any direct contacts with Nassco in regards to reproducibles." It would insist on furnishing the plans to FMB, as its contract provided. Agreement was reached that New York would send plans to FMB's San Diego office where Beattie would hand them to Nassco.

*Continued Delays.* The delays continued in August. In Beattie's next narrative report, he wrote that only 10 reproducibles had been received of 27 plans for the hull scheduled for approval by then; the remainder were requested "at the earliest possible date." Further, Nassco had received blueprints of two purchase orders and needed reproducibles of these and of any others placed. Beattie also advised that Nassco was unable to begin work because mid-body lines offsets received from New York had been found to be incorrect. He said, "It is considered by Nassco to be the responsibility of your Office to furnish same so that mold loft work may commence."

On August 4, Watson visited New York's yard at Camden, New Jersey, and found that of 41 approved reproducibles, purchase orders and requisitions, only 11 had been mailed. He noted that in his presence a representative of New York called the responsible department and asked for expedition of processing and mailing. Watson noted also that he had a "private discussion" with Joseph C. Czudak, the FMB's Construction Representative at the yard, and that Czudak would expedite items "upon request" of FMB Washington.

As of August 7, Nassco was lacking reproducibles of purchase orders for turbines, gears, boilers and other equipment. Corrections in the mid-body lines offsets were made by Nassco so that it could begin mold loft work. An interference was discovered between a mold loft offset and a keel drawing.

On September 8, Beattie repeated the request for hull drawings; Nassco had received only 10 reproducibles of 24 approved. He also sent a list of 20 machinery and piping plans, needed earlier than the contract schedule dates, so that Nassco could proceed to lay the keel of the first vessel, scheduled for November 14. At a scheduling conference before the signing of the contract, he wrote, New York had agreed that they could get these drawings out earlier than the dates for which they were scheduled, in order not to delay Nassco, which was starting its construction earlier than New York.

*The Appointment of a Project Expediter in September 1958.* On September 13, Hoffman designated Watson, a member of the Shipbuilding, Scheduling and Progress Branch of the Division of Production, to be special Project Coordinator for the contract "in order to provide a smooth flow" of working plans to Nassco. In his memo Hoffman said that "Due to the difference in construction schedules of the two contracting shipyards, it is already evident that considerable coordination will be required in order to provide National Steel and Shipbuilding Corporation with the information as needed."

2. *From the Appointment of the Project Expediter to March of 1959— Piping Plans, New York's Higher Priority Work, Errors and Alterations and Complaints of Delay in February and March.*

*Piping Plans and Higher Priority Work.* The 20 machinery and piping drawings called for by Beattie on September 8 were asked for again in his narrative reports on September 20, October 31 and February 27. Each request was transmitted by FMB Washington to New York Ship in Camden. Watson visited New York's yard to expedite the plans and on October 3, 1958 reported the cause of the delay. Mr. Sandberg, vice president of New York in charge of the furnishing of plans for Nassco's use, had told him that "the piping section of Engineering was overloaded with work on the NS Savannah and the aircraft carrier" Kitty Hawk. His memo does not speak of how long the overload might continue; the implication is that the plans would not be supplied at the needed dates: "Although it was promised that an effort would be made to expedite all of the twenty plans, it was considered doubtful if the submittal dates could be advanced to meet Nassco's required date."

Watson felt that the source of the problem was that Nassco had scheduled

its construction earlier than New York's, rather than following New York, the producer of the plans:

It is the writer's opinion that Nassco will have many problems brought on by the fact that they have scheduled keel laying of their first vessel five months ahead of the first vessel at New York Ship. The "following" yard, of most split contracts of this type, key construction to follow the "lead" yard.

He thought that the solution was for Nassco to increase its facilities and postpone steps in its construction schedule:

It may become necessary for Nassco to provide two suitable building ways and reschedule the keel and launch dates of the two vessels under contract.

Keel-laying was soon postponed, and postponement of launching followed later. Watson noted in a memo of October 30 that the pressure for the plans had "eased somewhat" because of the postponement of the keel-laying of Nassco's first vessel from November, 1958 to March, 1959.

In this memo, written after a visit to New York's yard on October 24, Watson reported that Sandberg had told him that Mr. Teale, president of New York Ship, had "taken a personal interest" in the machinery and piping section of engineering, and "it was expected that a marked improvement will be forthcoming from this Department. * * * Now that Mr. Teale is putting pressure on Department 9, plan development should be on schedule by the end of November."

As this optimistic report was being made, Beattie was on October 31 responding to Watson's earlier memo of October 3 reporting that the piping plans would not be supplied as needed. Noting that none of the machinery and piping drawings had been received and that Watson's memo was not too optimistic about getting them, Beattie said that "in the opinion of this office, it is very important" that Nassco receive these drawings "at the earliest possible date."

Watson's memo of October 3, he said, and particularly its conclusion, dealing with the construction schedule, had been discussed with Nassco's officers, who had stated that "as their contract was a separate contract with the Maritime Board it appeared to them it was the responsibility of the Maritime Administration to expedite the drawings from New York Shipbuilding Corporation, in order that fabrication, to commence in November, should proceed in orderly manner."

Washington responded to Beattie, with emphasis, that both New York and the FMB were making all reasonable effort. The memo, dated November 19, was signed by H. E. St. Clair, Chief of the Division of Ship Production, and dictated by Watson: "It is considered that all reasonable effort and reasonable diligence is being employed to prepare and to supply reproducibles of working plans, in accordance with the provisions of" New York Ship's contract with the FMB and the FMB's contract with Nassco, copies of which were enclosed. St. Clair's memo repeated the earlier statements that the cause of the delay was higher priority work and that the plans would be furnished in November: "At present, due to a higher priority workload, New York Ship is behind schedule on some piping and machinery plans for the subject program. Expediting action has been taken and it is expected that most of these plans will be furnished this month."

The memo continued: "However, it is pointed out that no times or dates were specified under terms of the contracts" with both yards "for completing and furnishing the reproducibles required." Further, citing the New York Ship–FMB contract: "New York Ship is primarily responsible to prepare working drawings, etc., and deliver the vessels constructed under [its contract] on contract dates."

This memo, too, implied that the fault lay with Nassco's construction schedule:

A part of the difficulty has been brought on by Nassco in their planned construction of the vessels under con-

tract No. FMB 66. Normally in a split contract the following yard gears construction to the lead yard, which is the more feasible way to schedule, and this has not been done by Nassco.

The hope that the piping plans would come and that plan development would be up-to-date in November did not materialize. Thirteen of the 20 piping plans, identifiable among the double-bottom piping plans in the stipulation, came between March and November of the following year, 1959. The record does not further mention any changes in New York's piping section, an interest of the president of New York in the drawing departments or the like.

*Errors in Plans.* Errors were first seen, according to the record, in July of 1958 in connection with the mold loft offsets. A memo in October discusses errors as causing delay in approvals. In the memo of October 30 forecasting improvement in the piping section in November, Watson said that the number of hull drawings "submitted by N.Y. Ship was generally satisfactory and only slightly behind schedule." He added: "However, it was again pointed out by the writer that the Owner's approval action on most of the plans are made with many comments which require review and additional drawing board work by the Contractor. In view of this, the writer stated that an assumption could be made that the plans, as submitted, were incomplete and not properly checked prior to submittal. Mr. Sandberg agreed that this was possible and will be brought to the attention of the responsible departments."

Errors nevertheless continued. In January, 1959, the Henry Co., American Export's design agents, asked Nassco for a copy of all of New York's drawings being used for fabrication of steel, because "we are still finding errors, interferences and omissions on New York Ship drawings covering the area where you are now working," and they could not be sure that Nassco had made the necessary corrections. Henry found fault with 55 of 100 drawings submitted by New York in early 1959.

The practice of the Henry Co. was not to disapprove drawings submitted by New York, but to "approve" them "with comments." Such approval was tantamount to disapproval inasmuch as the drawing was required to be redrawn and resubmitted. Reproducibles of plans so approved, on their face seeming to show unqualified approval, were for a time sent to Nassco when in fact they were being redrawn and resubmitted.

The euphemism "approved with comments" was designed to avoid offending New York Ship; a Henry Co. representative explained that "New York Ship does not like to have plans returned unapproved." This remark was made in response to a suggestion made by E. R. Kauffman, Assistant Chief of the Division of Production, on March 11, 1959, that unless the comments were few in number, plans should not be "approved with comments." He believed that they should be returned unapproved "unless we can rely on the contractors to insure that the comments are incorporated on the plan." The Henry Co. representative said, also, that "from experience, J. J. Henry Co. feels it necessary that they review the plans after New York Ship has incorporated the comments." He said that "he felt that there had been cases in which New York Ship incorporated only a portion of J. J. Henry's comments and issued the plan, but could not recall specific instances." Kauffman noted that the situation was the result of a misunderstanding and had recently been cleared up.

*Alterations and Delay.* This period also saw the first mention of delays from alterations in drawings previously supplied to Nassco as approved reproducibles. Twelve instances were reported in January, 1959 of work begun pursuant to reproducibles and halted or redone on the receipt of either a blueprint showing that an alteration was in process or a reproducible, presumably approved but

showing no approvals, containing an alteration in the previously furnished plan. Beattie reported on January 30 that the amount of rework caused by these alterations was "of such a serious nature" that Nassco was considering stopping all work until the problem was solved. While Schlosser, Nassco's representative at Camden, was trying to solve the problem, Beattie said: "I believe your office should have Mr. Watson, MA project Engineer, check into this problem." St. Clair's response of February 5, dictated by Watson, stated that the records of alterations available to FMB Washington had left it unaware of the problem and that, as pointed out in Washington's memo of November 19, "it was contemplated that some difficulties would be encountered due to Nassco's planned construction."

On March 11, Kaufman asked the Henry Co. why there were so many alterations. The response "expressed some dissatisfaction with New York Ship's plan work;" the Henry Co. felt it had to do much more detailed checking than had been anticipated. Kauffman gave his opinion that it was "the owner's prerogative to protest to New York Shipbuilding Corporation," but, he noted, neither the American Export nor the Henry Co. representative "seemed inclined to actually go on record." The subject does not seem to have been further pursued.

*Complaints in February and March 1959.* On February 27, Beattie called for 35 machinery and piping plans, including at least 13 of those first requested the prior September. (While the record is not clear, 13 of the September 8, 1958 drawings are identifiable on Beattie's list of February 27, 1959.) He stated his "unbiased opinion" that if FMB Washington did not "help out" there would be continued delays in construction:

It is the unbiased opinion of the undersigned that your Office may have to help out in the existing situation in order to eliminate problems involved as the undersigned foresees continued

delays to construction of subject vessels if this is not done.

It does not appear when all of the 35 plans, later reduced to 28 by deletion, were supplied. Eighteen of them, however, appear among the piping drawings whose lateness is stipulated. One was issued on February 25, 170 days late; 17 came between March and September of 1959. Two of the 18 were not late by the contract schedule dates but were five and six months later than the specially promised dates referred to in the original request of September 8, 1958. The remaining 16 were late by the contract schedule dates as follows: 1—19 days late; 7—50 to 100 days late; 6—100 to 200 days late, and 2—230 days late. They were from one to seven months additionally late by the specially promised dates.

Beattie's report of February 27 was shortly followed by another complaint from Nassco to Hoffman, dated March 3, reciting the efforts Nassco had made through Schlosser to obtain the machinery and piping plans and the repeated requests to Beattie. The delay of inner-bottom plans was now holding up work on 24 fabricated inner-bottom sections, and had caused a six-weeks' delay in production. Lacking reproducibles, Nassco had been compelled to begin work on the basis of blueprints. The letter stated, first, Nassco's understanding that the cause of the delay was higher priority work at New York's yard, and, second, urged the FMB to appraise, with New York, the overall situation for piping and machinery drawings, and take whatever action was appropriate to prevent future delays.

3. *March 1959—New York's Higher Priority Work and the Abandonment of the Contract Plan Schedule.*

According to the FMB's first quarterly status report, dated March 24, 1959, New York had submitted only 260 plans of 340 plans scheduled by then, and only 178 had been approved by the Henry Co. (Plaintiff's claim gives the figures as 440 plans scheduled according to the con-

tract schedule, and only 150 received.) The St. Clair report states that the delay had disrupted construction of Nassco's first vessel:

> Plan development continues to lag due to higher priority work. Furnishing of reproducibles of approved drawings to MA for use by Nassco, especially the piping plans for innerbottoms, is behind schedule and has disrupted orderly fabrication, subassembly and erection of MA Hull No. 58.

Nassco's complaint led to a meeting of the FMB and New York on March 11, to appraise the situation. The FMB was represented by Kauffman and Watson and New York by Sandberg and others. The product of the meeting was an agreement to propose to Nassco a new procedure—Nassco would list the drawings it most urgently needed, without regard to the dates in the contract schedules, and New York would then concentrate its efforts on the drawings so listed. The new procedure was described as a revision of the contract plan schedules; it was actually an abandoment. The government in its brief states that in March 1959 "due to delays in delivery," the contract schedule "had become inapplicable and an attempt to adhere rigidly to it would have caused confusion and more delay."

The FMB memorandum of the meeting, dated March 16, was dictated by Kauffman and signed by both Watson and Kauffman.

Its relevant portion has very substantial significance and is quoted in full:

> While we have not yet received the latest issue of the plan schedule which should reflect the considerable amount of work accomplished during the past month, it was suggested that New York Ship make any necessary revisions to show realistic dates based on the present work load. Also, that it might be well for New York Ship to go on record with Marad stating that the revision in plan dates in relation to the initial schedule is necessitated by reasons beyond their control. Mr.

Sandberg stated that the revisions of these plan schedules were necessitated by higher priority work, such as the Aircraft Carrier and the NS Savannah. However, he objects to initiating any correspondence which might be construed as relating to the contractual responsibilities. He advised, however, that he has initiated a request to Nassco through its representative, Mr. Slosser, to provide New York Ship with a revised schedule of plan needs rather than in relation to the date originally scheduled. He will in turn, then endeavor to expedite those particular plans most urgently needed by Nassco. This appears encouraging as New York Shipbuilding is now working directly with Nassco at least to a degree.

It appears from this memorandum that while New York claimed that the "revision" of the contract plan schedule was "necessitated" by higher priority work on the Savannah and the Kitty Hawk, it would not make such a statement in writing. Further, that the FMB representatives raised no question or objection either to Sandberg's excuse of higher priority work or to his refusal to put in writing a statement with respect to the higher priority work or to other reasons beyond New York's control.

Sandberg said, at the meeting, that the contract schedule dates would not be "relaxed" without Nassco's agreement. Nassco had little choice but to agree; its agreement was solicited by both New York and the FMB, and the promise was one of expedition over what might otherwise happen.

Following the meeting, Hoffman answered Nassco's letter of March 3. His letter, dated March 20 and dictated by Kauffman, opened with a statement that "this office has made a thorough review of the status of plan development, approvals and reproducibles furnished to you, having conferred with Messrs. W. J. Dorman of American Export Lines, C. D. Henley of the J. J. Henry Company" and others. The implication that the new procedure of the letter had

been discussed with American Export and the Henry Co. was incorrect. On the day before the FMB-New York meeting, Kauffman had met with representatives of American Export and the Henry Co. in connection with errors and alterations. The subjects of the FMB-New York meeting were not discussed and neither American Export nor the Henry Co. attended the meeting of March 11.

Hoffman went on to the subject of a revised plan schedule:

> In an overall appraisal of the plan situation, New York Shipbuilding Corporation is requesting, through your Mr. Schlosser, a revised plan schedule showing the urgent plan needs in relation to your construction progress. New York Shipbuilding Corporation will then endeavor to meet the most urgent needs. This revised schedule should be as realistic as possible, based on a construction schedule from now on, preferably utilizing two building ways, and without regard to the initial plan schedule. It should be borne in mind that the Federal Maritime Board will "employ all reasonable effort and reasonable diligence" to supply reproducibles of approved plans on dates compatible with the initial schedule of submittal dates referred to in Addendum No. 3 to the contract specifications, but there is no contract requirements on the part of the Federal Maritime. Board to provide these reproducibles on specific dates, or to warrant their completeness and accuracy.

By this letter, Hoffman, assuming that Nassco would agree to the new procedure, gave notice that with the adoption of the new procedure the FMB would continue to perform its contract duty to exercise efforts, but not efforts to make delivery on the dates in the contract plan schedules. The new objective would be dates "compatible" with the contract dates. The contract plan schedules were downgraded, in the letter, to an "initial schedule," and the scheduled dates to "submittal dates" (the last a reference to the fact that the dates in the schedules in both contracts were identical, discussed in Part I of this opinion).

Hoffman's letter goes on to New York's higher priority work, on which Nassco's letter of March 3 had said:

> We further request that you review with the lead yard the overall picture for machinery and piping drawings. It is our understanding that priority of other projects at the lead yard has caused a serious lag in all piping and the machinery plans for the subject program. If this is so, appropriate action should be taken at this time to prevent a serious future delay in our schedule.

To this Hoffman now answered as follows:

> It is true that the New York Shipbuilding Corporation has other contracts to which specific Priority Ratings have been assigned under the Defense Materials System. Neither your contract FMB-66, nor the New York Shipbuilding Corporation's contract FMB-65 for the American Export vessels, carries any such rating. Hence, we have no recourse to priority actions.

Nassco had requested that FMB review with New York the effect on the production of machinery and piping drawings of higher priority work at New York's yard and, if it were so that higher priority work was the cause of the delay, then the FMB should take appropriate steps to prevent future delays. Hoffman's response misinterprets Nassco's letter, reading it as a request for a priority, and avoids any comment on any delaying effect, past or future, of New York's higher priority work on plan production for the cargo vessels or on what, if anything, the FMB would do about such delay.

4. *March to July 1959—Optimism, Further Errors and Alterations, Continued Delays and Complaints of Delay in July.*

*Optimism.* Hoffman's letter of March 20 said that "the most urgently needed piping and other plans have now been furnished;" on March 24, Watson said that 75% had been furnished. The record indicates that New York had as of then furnished 11 of 28 needed piping plans (the 35 of February 27, 1959, reduced by seven deletions).

Watson and Kauffman telephoned Beattie to tell him that with the adoption of the new urgent-need plan procedure, things would now improve. In his next narrative report of March 31, advising that Nassco had forwarded its first urgent-need list, Beattie responsively commented that the new procedure "will no doubt eliminate much of Nassco's problems reference drawings."

*Errors and Alterations.* Errors in drawings and alterations in approved reproducibles already put into work continued. In his March 31 report, Beattie advised of errors in drawings which he would report to the Henry Co.: " * * * in reviewing NYS' drawings, many mistakes similar to what Nassco is complaining about are being observed by the undersigned which will be called to the attention of the local J. J. Henry representative." In April, Nassco complained to Beattie about six instances in which it had been required to hold up work, on the receipt of a blueprint showing alterations made subsequent to the reproducible in its possession. One of these cases was described by the Nassco engineer on the job as follows:

A situation has now developed which I believe should be thoroughly examined by the company. Basically these are the facts:

1. Plan approved by all regulatory bodies and J. J. Henry.

2. Reproducible received by Nassco.

3. Material ordered and plan issued to yard.

4. System fabricated and installed in ship.

5. Approved print of major alteration to system received from NYS, under our separate contract. No intimation of change officially from Marad.

St. Clair's first quarterly status report of March 24, 1959 (written by Watson) had already suggested that Nassco's difficulties with alterations were the result of its failure to postpone its construction to match the deliveries of plans:

In October 1958, the Contractor revised the key event dates, with scheduled postponement of keel laying from November 14, 1958, to March 1, 1959. This date, although earlier than the scheduled keel laying date of the first vessel at N.Y. Ship, would have been more in line with working drawing development. However, the Contractor decided to lay the keel for this vessel on January 22, 1959, and has experienced difficulty in proceeding with work and was faced with the problem of starting work and finding that alterations have been made to the original reproducible which is entailing rework of work already accomplished.

During a visit by Watson to Nassco's yard on April 29, Nassco told him again of the need for reproducibles of latest alterations and of the rework caused by alterations. His memo reads: "The writer pointed out that this situation was brought on primarily due to the planned construction, whereas, the keel and launch dates for the first vessel is ahead of the dates for construction of the first vessel at NY Ship." Also, that Nassco had said that the rework was "in the past" and had advised him that receipt of reproducibles had improved and "in general is satisfactory."

*Continued Delays.* The next urgent-need plan list under the new procedure, dated May 25, contained 15 plans, several of them piping plans. (The record shows the lateness of four of them. Two were by the plan schedule due in February, 1959; they were not supplied until May and June. Two were due in January; they came in September.) Three days later, on May 29, Beattie reported eleven plans not in agreement with other plans, and urgent need for

some 45 machinery, piping, wireways and lighting plans. Watson responded on June 17 that he had requested New York to expedite them. On June 23, he visited New York's yard and "briefly discussed" Beattie's list of "quite a number" of plans, again asking that they be "expedited." On June 30, when the plans had not come, Beattie wrote that they "were sorely needed" even before their scheduled dates.

The delay in plan production was now a threat (actually realized) to New York's ability to complete its vessels by the delivery dates, and the FMB was concerned. In the memo of his visit of June 23 to New York's yard, Watson wrote that he had said to a Mr. Bullock of New York Ship that "Due to the Contractor's delay in plan development and start of construction that the current schedule of events presents a very tight construction period" for New York's own vessels. Also, that he had "cautioned the Contractor that further delays in plan development may not only have a delaying effect on their own work, but would definitely have an adverse effect on construction of the two vessels" by Nassco.

Watson put part of the blame on the FMB office at New York's yard. On his arrival at the yard, Czudak, the FMB's Construction Representative, was occupied with visitors from the Nuclear Project Office and was not available to discuss the cargo vessels. Watson felt that the Construction Representative's staff should spend more time on the contract for the cargo vessels:

It is the writer's opinion that the staff of the MA Construction Representative's office are utilizing most of their time and efforts on the NS Savannah. This apparently is necessary due to the amount of problems involved and limited staff. However, the first keel of subject program was laid on June 8, and with the new short building period, and necessary rate of progress required, this contract should receive more attention by the field office.

The Construction Representative was not the only FMB officer engaged both in expediting of the Savannah and the cargo vessels. Watson was apparently also involved in coordinating efforts on the Savannah and on a submarine in construction at New York's yard. Hoffman, too, seems to have had at least an interest in the Savannah. When he visited New York's yard for a "high level" conference on delays in plan deliveries, to be discussed below, he devoted half his memo on the visit to his talk with Czudak on the Savannah.

In Beattie's narrative reports in June and July, he forecast delay in construction, saying that Nassco's first hull, scheduled for launching October 1, 1959, would probably be postponed to after January 1, 1960. Apparently avoiding the subject of plan delays, he gave as the reasons a lack of work force in structural and pipe work and the fact that certain work had not started sooner. He did not mention plan delays, though it was in one of these memos that he had said that 45 piping and other plans were "sorely needed." Another forecast was made on June 15 by H. V. Kissel of the Division of Production, in the FMB's second quarterly status report. He prophesied that the launching of both hulls at Nassco's yard might be delayed "as a result of the lack of plans noted in paragraph 2." In paragraph 2, he wrote as follows:

Plan development continues to lag. Nassco required numerous plans relative to Hatch End Beams and Hinge Recesses which have not been brought into agreement with Greer Hatch Plans, Auxiliary Machinery Foundation Plans, Plans covering Penetrations and Electrical Wireways Plans. These plans are needed to maintain continuous orderly erection of hull No. 58. This office has requested expediting action on these plans.

In June, Beattie reported that shipment of reproducibles had dropped off considerably, to 50% of May receipts, and in July he reported that shipments of reproducibles had again decreased.

*Complaint of Delay in July.* In another formal letter of complaint from Nassco to FMB, dated July 31, Nassco raised the possibility (not actually realized) that the delays in construction caused by late deliveries of plans would prevent completion of its ships by the contract dates. The letter, as had its predecessors, invoked FMB's contract obligation to employ all reasonable effort and reasonable diligence to supply the plans on the dates in the contract schedules; said that Nassco's efforts through Schlosser to expedite plans had met with only small success or lack of a sufficient basis in contractual relationship with New York; and stated that New York had failed from the beginning to keep to the schedule and was now again seriously behind in furnishing drawings, even under the procedure begun in March of urgent-need required dates.

Nassco enclosed with its letter a fifteen-page review (not in the record) of all plans, said to show that 200 plans were now late by Nassco's required dates, dates which were in most cases several months later than those in the contract plan schedules.

Nassco's construction schedule, calling for delivery of the ships ahead of contract delivery dates, the letter said further, was "predicated on timely receipt of drawings." Nassco warned that the delays in plan delivery were now threatening even contract delivery dates:

> Unless immediate action is taken by the Federal Maritime Board to alleviate this condition, furnish us promptly with overdue drawings, and insure delivery of the balance on our required dates, there is strong possibility that we will be unable to deliver the vessels by the contract dates. We, therefore, urgently request that positive action be taken to remedy this situation and forestall further slippage of dates.

5. *August, 1959—The FMB's Review of its Efforts and a High Level Conference on Plan Delays.*

*The FMB's Review of its Efforts.* Nassco's complaint was the subject of an FMB memo dated August, 1959, undersigned but apparently written by Watson, in which the FMB's efforts at expedition were comprehensively reviewed.

The memo relates that New York Ship has been told "on numerous occasions" that by contract it was to employ all reasonable effort and reasonable diligence to supply the reproducibles to the FMB in accordance with the dates in the plan schedules. "On the other hand," the memo continues, "Nassco has also been informed a number of times that they could expect trouble due to their planned construction leading construction at New York Ship. This is not good shipbuilding practice for a 'so-called' following yard."

The furnishing of drawings in April and May, the author continues, "was satisfactory with a few exceptions," but in June and July, New York Ship "started slipping again and submittal and issue dates as scheduled were not met." He refers to Beattie's May narrative report list of a "number" (actually 45) of plans urgently required by Nassco. "Many of the plans have now been furnished for Nassco, and Mr. Czudak and the Contractor have been requested to expedite the remaining plans."

Turning to Nassco's list of 200 plans, the author first reduces the number by 23—three have been combined with others, five do not show "required dates" and 15 do not have "New York promised dates." He then comments on the remaining plans as follows:

(a) 30 have been issued since Nassco's letter. These are checked in red pencil.

(b) 17 were listed by Beattie in May, and "expedition has been requested." These are checked in green pencil.

(c) 86, checked in purple pencil, "are not behind N.Y. Ship's current promised issue dates."

(d) 45, checked in orange, "are considered the most urgent at this time and should be expedited."

The author sums up his comments: "It is agreed that New York Ship has been behind schedule in plan development and 'release for manufacturing' for the items which Nassco is required to purchase in exact duplicate."

Referring to the meeting of May 11 with New York Ship at which the urgent-need list procedure was agreed upon, New York's excuse of higher work on the Savannah is, again, as in the FMB memo of that meeting, ascribed to Sandberg: "During the visit on March 11, 1959, Mr. Sandberg of NY Ship stated that the revisions to their plan schedules (submittal and issue dates) were necessitated by higher priority work, such as the 'Carrier' and the NS Savannah." The urgent-need list procedure is described as a revision by New York of its submittal dates "to agree as closely as possible with Nassco's required dates." The 200 consequent changes in New York's anticipated submittal and issue dates are called "NYS indicated changes made to suit Nassco's Plan requirements."

The penultimate pargraph: "However, it is not considered that the efforts of this office have been a total loss as NY Ship complied with many of our requests for expediting action." Further, "It is considered that the situation is not as critical as may appear" from Nassco's letter and enclosure. While completion of the vessel may not be feasible at the scheduled time, August 1, 1960, unless plan development can be improved, "the contract delivery date of January 10, 1961, for the first vessel is entirely feasible at this time."

Lastly, the author repeats the earlier criticism of the FMB's staff at New York's yard. Mr. Czudak and his staff have been helpful on special request. "Although as indicated in the memo of June 29, 1959, it is not believed that the field office at NY Ship is following the contract for AEL Cargo Vessels as closely as is done in other field offices. (Reference is made to the Narrative Reports submitted to this office [of which only two are in the record] to bear this out.)

It is entirely possible that more time cannot be given to this work due to the amount of problems involved on the NS Savannah."

*The "High-Level" Conference of August 7, 1959.* The foregoing memorandum seems to have been written in anticipation of a "high-level" conference on Nassco's complaints of delays in plans. The conference took place on August 7, 1959 and was attended by Hoffman for the FMB, by Admiral Will, president of American Export, by the president of New York Ship, Mr. Teale, and by others of their organizations and by representatives of Nassco. Three reports were made of the meeting.

Nassco's representative reported as follows: Mr. Teale would at first not allow Nassco to attend, for fear of a legal obligation to Nassco, and he would not recognize any plan dates to suit Nassco for fear of a suit by Nassco if New York Ship should not meet the dates. Admiral Will reminded Mr. Teale that New York's contract with FMB and American Export contained a clause requiring that it exercise due care and diligence in all work; that Nassco's contract was based upon plan schedules filed by both New York Ship and Nassco at the time of the signing of the two contracts; and that New York Ship "had changed the schedule in such a manner that its exercise of care and diligence was in doubt."

Hoffman also urged Mr. Teale to reconsider: "Mr. Hoffman drew attention to the possibility of a charge of unethical conduct being leveled at Mr. Teale," a remark not otherwise explained. Mr. Teale was thereby prevailed upon to allow Nassco's representatives to be present, on condition that they address themselves to American Export and FMB. New York Ship, he said, would not wish to hur Nassco and Nassco's letter of July 31 was "just the thing needed to push the work to completion."

American Export's memo of the meeting noted, briefly, that New York took the position that in the interest of avoiding a damage action, it would not make

representations to Nassco, and that while Mr. Geary of New York said that New York would endeavor to meet Nassco's position, "Mr. Teale refused even to acknowledge existence of the [Nassco] priorities." The memo reported that New York Ship agreed to endeavor to in order to cause Nassco a minimum of prepare Nassco's priority drawings first, hardship. (It was in connection with this agreement that Mr. Teale refused to acknowledge Nassco's priorities but said he was prepared to assist "as a favor" to American Export and FMB.) "It was stated that New York Ship would have to prepare these plans eventually and that they would themselves incur no inconvenience or expense by expediting the 'priority' drawings."

Further: Mr. Geary of New York commented that "New York Ship planned to be up to date on its drawings according to their Plan Schedule by the end of the year" or earlier, in September or November, "Mr. Geary also informally suggested that all the New York working drawings would be done soon after the beginning of the year."

Hoffman's memo, the shortest of the three, noted that the meeting had been called to discuss New York's progress in preparing plans "with special reference to use of plans" by Nassco. That "Nassco being a smaller and newer Yard requires more plan lead time than New York Shipbuilding Corp." His description of the meeting read as follows:

While New York Ship has no contractual responsibility to produce plans on any other schedule than to insure delivery of their own ships, it was agreed, that they would exercise "due diligence" in the preparation of the plans to meet the requirements of Nassco. Special priorities were set up. The design agent would expedite all plan approval work.

The remainder of his memo concerned his discussion of the Savannah with Czudak, who had accompanied him to the meeting.

6. *From August 7, 1959 to the Last Plans in 1960—Complaints of Delay,* *Increase of Expedition Efforts and Last Delays.*

*Delays in August and September.* In September, Nassco complained of the number of plans on its first urgent-need list under the August 7 agreement which had been furnished in August. The following month it complained that only 27 of 39 priority plans had been furnished in September; the 39 had been selected at a conference with the help of Admiral Will of American Export, were "absolutely urgent" and required with the "utmost expedition."

As before, alterations continued to be made in reproducibles already in Nassco's hands and in use in construction. Twenty such instances were complained about at the end of September.

*Mailing and Record Errors, August 1959 to March 1960.* Several instances appeared of irregularities in the mailing and recording of plans:

(a) In August it appeared that some reproducibles needed by Nassco had been returned to New York Ship's storage vault instead of being furnished to Nassco.

(b) On September 2, complaint was made that nine reproducibles did not show approvals by regulatory bodies.

(c) On September 24, the FMB queried New York about the 20 instances, mentioned above, of alterations in reproducibles in work. Eleven reproducibles of the plans as altered were sent by New York on one day, October 5.

(d) In October, inquiry was made as to seven reproducibles recorded as having been approved. It appeared that they had been lost or not been furnished and copies were sent.

(e) In response to a call from Nassco for seven plans, Czudak on January 5 reported that they had been mailed on December 29. A pencilled note on the FMB memo states that the drawings did not appear on shipping memos until February and March.

(f) In January, 1960, FMB Washington passed on to Czudak Nassco's

request for expedition of three plans. On January 12, he reported advice from New York that they had been mailed on December 17 and 22. In fact, the plans were not mailed until January 19.

(g) On February 19, Beattie wired for better copies of three reproducibles of poor quality. They had not been replaced by March 1.

(h) In May it appeared that six plans issued between July of 1959 and January of 1960 had not been sent to Nassco.

(i) In March it appeared that substantial numbers of plans had been sent directly to Nassco, and not to FMB, despite New York's position since 1958 against direct mailing to Nassco. FMB Washington's records were to this extent incomplete.

The FMB Construction Representative at Camden played a more active part than earlier, especially in these incidents.

*Delays as of the end of 1959.* In early 1960, Nassco complained to the FMB that plans received had on an average been eight months late per contract plan schedules; and by the urgent-need lists, five months late at the end of 1959 and an average of three months late since March, 1959.

On February 10, Nassco, recalling New York's promise of August 7, 1959, that all the plans would be finished soon after the beginning of 1960, complained that New York was 100 drawings behind at the end of December and 130 behind at the end of January. Nassco said that it understood that a basic reason for late deliveries had been the diversion of part of the engineering force to higher priority jobs, and that it "seriously" questioned whether in view of performance, the FMB's action constituted reasonable effort and reasonable diligence. Hoffman answered on April 12; the answer is described below in chronological place.

*Some Consequences.* As of January 8, the absence of 73 priority plans was affecting material ordering. On February 5, Nassco reported that the lack of 58 machinery and piping plans was causing serious delay in the construction. Interferences between plans were the cause of numbers of work stoppages. In its letter of February 10, Nassco advised that plans received were not only late, but were often unusable; that 72 hold-ups in work had been necessary, 45 strictly for interference between drawings.

*Increase in Expedition Efforts.* On receipt of Nassco's letter of February 10, Hoffman asked New York for comments, his staff made several visits to New York's yard, and he wrote New York that it was "imperative" that it furnish 55 hull, 135 machinery and 9 electrical drawings. (The total of 199 drawings was greater than the 130 Nassco had complained about. Without advising FMB Washington, New York had sent some plans directly to Nassco instead of to Beattie at FMB San Diego.)

Hoffman suggested to New York that a meeting be held on the late plans and Kauffman and Watson met with New York a week later, on March 15. They reported as follows:

(a) They had discussed the list of late plans with the separate departments for hull, machinery and electrical plans.

(b) "It is obvious, and New York Ship agrees, that they themselves are hard-pressed for plans in order to finish their first vessel on contract dates." New York agreed that some plans were too late for their own construction and were to be reviewed with the objective of improving the dates.

(c) They had consulted Schlosser for his views. He was working well with New York and receiving its cooperation.

(d) Hoffman's telephoned request to New York for comments on Nassco's letter of February 10 would be answered soon. Kauffman and Watson suggested that "it might be

advantageous to have someone from New York Ship who is capable of discussing the subject bring the comments to you [Hoffman] in person."

They had been given unlimited time by New York's staff, talked to Mr. Teale briefly, and felt that New York had exercised conscientious efforts throughout:

In reviewing the entire problem, it is believed proper to say that in all cases in which we have received requests from National Steel to expedite specific plans and, have transmitted such requests to New York Ship, they have put forth conscientious effort to meet our requirements to, in turn, satisfy National Steel.

After the meeting, New York responded on March 17 with a marked-up list of the late plans. Some had just been sent to Nassco; others were marked "will submit," "will issue" or "will resubmit" on stated dates.

The plans for the galley and commissary were repeatedly delayed and became particularly urgent. As of March 8, their absence was preventing work on piping, electrical work, painting and installation of hull insulation. Kauffman and Watson reported that notice was received on March 15, while they were at the yard, that the galley plan had been disapproved by the Henry Co. with a "request for rather major revisions."

Plan deliveries as of this time were summarized in the FMB's fifth quarterly report, dated March 17, 1960: "Plan development continues to lag and submittals are still behind schedule;" 100 reproducibles remained to be furnished to Nassco, of which half were "required for construction and/or material ordering;" and a new estimated date of "end of March" had been established for the completion of all "first submittals."

Watson made another visit to New York Ship on March 25, and reported that:

(a) "A short discussion was held with Mr. Czudak re the subject matter. However, due to pressing problems on the Savannah, Mr. Czudak was unable to spare any time for discussions with the Owner's Representative or the staff at N.Y. Ship."

(b) Schlosser had advised that New York Ship was three months behind in construction. He had therefore recommended to Nassco that it will have to clear up the interferences in the plans.

(c) An interference between head room and ceiling heights was to be resolved in a New York-Henry Co. meeting on March 29. "Mr. Schlosser was invited to attend this meeting as an observer. (It is considered that this should be advantageous to Nassco.)"

(d) New York had promised to resubmit the galley plan to the Henry Co. on March 25 and to comply with the Henry Co. comments. An advance blueprint would therefore be given to Schlosser for Nassco to satisfy Nassco's immediate needs.

It appeared that the "end of March" date in the fifth quarterly report for completion of first submittals would not be met. Watson noted:

(a) that there was some slippage of "some estimated submittal, or resubmittal, dates for a few machinery plans;" that "Apparently some of the engineers in Dept. 9, Machinery, had been assigned work in connection with Invitation for Bids for Navy Destroyers."

(b) that he had suggested to a Henry Co. representative that "as the Owner's representative he could possibly exert some 'pressure' on NYS to clear interferences and alter plans, when required, promptly so his inspection force would have reliable plans to use in checking work on the vessels under construction at NYS. In this way Nassco would also be benefitted."

After another visit by Watson to New York on April 8, Hoffman on April 12 answered Nassco's letter of February 10.

In this letter, which Hoffman dictated, he wrote:

(a) According to FMB Washington's records through April 5, "reproducibles for first issues have been furnished for all plans, listed in New York Ship's Plan Schedules, except for approximately 57."

(b) "Of these it is considered that less than 50% are required for construction and/or material ordering. The majority of the remaining plans are normally the last to be developed by any Design Agent."

(c) Final approval of the galley plan, the "most urgent," was expected during the "week of April 11."

(d) During the visits of his staff to New York "Assurance was given that New York Ship will endeavor to submit all the remaining plans required for construction and/or material ordering by mid April 1960."

Hoffman made no response to Nassco's questioning of the FMB's efforts in view of its understanding that higher priority work was a basic cause of delays. Hoffman said that "additional comments" on the "overall phases" of Nassco's letter would be made in a separate letter, but such a letter is not in the record.

The "mid April date" mentioned by Hoffman was not met. On the next FMB visit to New York's yard, it appeared that:

(a) Four of the composite drawings for bridge and navigation bridge decks were "currently scheduled for issue May 9, 1960."

(b) Four machinery drawings (once promised for April 8, and then for "early in week of April 11") were now "promised" for submittal during "week of April 25." In addition, eight hull drawings had not yet been submitted for approval; and some 30 were awaiting approval.

(c) The plans for the galley, now twice altered, had been submitted on April 20.

(d) Ventilation plans were being altered as a result of the conference on interference between head room and ceiling height. Alteration C of a ventilation drawing, on which 14 comments had been made by the Henry Co., was being furnished to Nassco for use without approval.

(e) Eight plans were awaiting approval by FMB. Its Division of Ship's Design was "behind on approval due to more pressing work on the Savannah." Authority to approve would be given to the FMB local office.

(f) Kingposts drawings were the most urgent. They had been the subject of a "number of comments" by the Henry Co.

On May 2, 1960, Hoffman wrote Nassco that all reproducibles for first issues had been furnished "except for approximately 43," of which 23 were "required for construction and/or material ordering."

Watson visited New York's yard on May 6 and discussed with representatives of New York's engineering departments 10, 9 and 6 the status of 24 working drawings, 18 non-working drawings and 20 alterations; his memo lists the status of 23 individual plans. He expected that plans required for construction and/or material ordering would be completed by mid-May, "with the possible exception of alterations to drawings in upper decks," and that all plans should be completed by June.

He noted that he shared the opinion of the Henry Co. that New York would be about four weeks late in completing its first vessel (it was actually about six weeks late), primarily because of late delivery of kingposts. He had told the New York representative that plan development for the cargo vessels had moved "very slowly" in "some sections" of engineering:

A brief discussion was held with Mr. Fixman in his office regarding the subject matter. The undersigned pointed out that in some sections of engineering, plan development, includ-

ing alterations to dwgs., has moved very slowly on this contract. Specific cases were cited, such as Dwgs. for: Main Gally Dets.; composite dwgs. for 2nd Deck, Main Deck & Upper Decks to clear interferences; 2nd Deck Ventilation; Dets. of Rigging Fittings, etc. Mr. Fixman made some notes and stated that it was realized that plan development in some areas had been delayed, especially in the ventilation section, due to problems encountered including overload of work on other contracts.

Watson last visited New York's yard on May 19, where he reviewed, with representatives of engineering departments 10, 9 and 6, the status of submittals of first issues of 14 working and 15 non-working drawings still outstanding. He noted in his memo that all first submittals had now been submitted and that he considered that routine visits would no longer be necessary.

*The Last Plans.* Plans were still outstanding in June. As of July 15, an FMB memo stated that 12 reproducibles remained to be furnished to Nassco, none of them "required for construction or material ordering." The memo apparently refers only to first issues. The stipulation on lateness of plans, all claimed to have caused increased costs and thus presumably plans required for construction, shows that 20 last alterations were supplied in June, five in July and August and five in October of 1960.

VI

*The Deficiencies in the FMB's Efforts*

The government contends that the FMB assigned more personnel than on any other contract to the task of making the efforts required in compliance with the contract duty, and that these men in many letters, telephone calls and visits did all that could have been done to hasten delivery of the plans.

The efforts made are reflected in the memos and letters, reviewed in Part V, written by or to the officers of the FMB engaged in administration of the contract and expedition of the plans. In 1958, J. E. Watson, the special expediter for the FMB, made seven visits to Camden and one to San Diego; in 1959, five to Camden and two to San Diego; and in 1960, six to Camden. The number of the doubtless many visits, telephone calls, letters and memos is, however, not decisive. Whether "all reasonable effort and reasonable diligence" were employed to supply the plans to Nassco on time depends on what occurred during these visits, what efforts were made and with what intensity, and what efforts were not made which might reasonably and appropriately have been made, in view of the delays which occurred, the objective of timely supply to Nassco, and the importance of the objective.

The FMB describes its work of making the required efforts as "production coordination," which means seeing to it that the contractor gets things done, in this case that New York employed all reasonable effort and diligence to produce the plans on time. A single word for the work is "expedition." It is done, as necessary, by asking, reminding, pleading, urging, suggesting, assisting, pressing, prodding, exhorting and complaining; by searching questions and independent inquiry into the causes of delay and the excuses and justification offered; by rejecting the excuses and suggesting steps to overcome the causes and by insisting that the steps be taken. It may require the demand of intermediate promises and intermediate deadlines; hints or warnings of economic and legal consequences if the work is not hurried and finished; bringing up as reinforcements the home office or others with an interest in expedition; by calling on lawyers to advise and to assist and any other device known to the expediter expert in his field or devised for the case; in short, the exercise of every variety of what one of the FMB expediters called, in quotation marks, "pressure."

The FMB expediters failed in the work of expedition, so defined. If, as the government says, their duty was to "remind,

persuade, exhort, assist," they stopped with reminding, though the need to continue to more intensive efforts was plain. Their increase of efforts in late 1959 and particularly in 1960, though still insufficient and too late to undo the damage, shows by contrast the deficiencies in their earlier effort and diligence. They were content to transmit Nassco's requests for expedition, adding their own request, and to remind New York when the plans did not arrive. Watson, the special project expediter, described his method of expedition as "pleadings, relying on their cooperation, bringing to their attention * * * also by periodically reminding them that many plans were behind schedule, and keeping them informed of the plans as I knew them that were late * * * and requesting that they * * * put out all reasonable effort and diligence to provide these plans." His approach was "to handle without overexpediting or without antagonizing the people at New York Ship." He "made no enemies," he said; "I do not believe that anyone can demand."

The expediters minimized Nassco's needs. They called the amount of delay, "some delay," "plan slippage" or "some slippage;" the number of late plans was described as "some" or "certain" "piping and machinery plans," or alterations. The 45 plans described by Beattie as "sorely needed" were called "a number" or "quite a number." In the FMB memo of August 1959, the 200 plans listed by Nassco as late were first reduced by questionable means to 177, and then subdivided into smaller numbers. Thirty plans furnished since Nassco's complaint were subtracted from the remainder of 177, yet in the accompanying data comparison was made between the number of plans required through May and the number issued through July. When in April 1959, Nassco complained to the visiting expediter about the stoppages and rework caused by alterations in plans, he described the rework, in his memo, as "in the past," though six instances had been reported to Beattie

within the week of alterations arriving after the work had been done.

New York's performance, on the other hand, was presented favorably. The expediters seemed to prefer the number of drawings submitted by New York over the number approved, and the number approved over the number actually received by Nassco. The number of plans furnished was maximized by describing plans as those required for "construction and/or material ordering" or by statements that "many" or "75%" of the plans, or the "early required" plans "have now been furnished." Exceptions were postponed to second place.

New York's optimism was accepted at face value. Thus purchase orders "should be placed soon;" late plans are said to be "in preparation," "expected soon." In October 1959, the expediters said that "plan development should be on schedule by the end of November." In March of 1960, at the end of the two-year series of delays, they praised New York: " * * * in all cases of requests for expedition of specific plans they (New York) have put forth conscientious effort to meet our requirements to, in turn, satisfy National Steel." When in May of 1960, it became clear that New York would not deliver its ships on contract dates, an expediter told its representative, in gentle criticism, that "in some sections of engineering, plan development, including alterations to drawings, has moved very slowly on this contract."

There comes a time in dealing with a contractor whose performance is failing when reminders must give way to exhortations, admonitions and specific demands. The time seemed never to come for the FMB. It did not admonish New York that so many plans were late; that the scheduled dates were so many weeks and months past; that the delays were causing work stoppages costly to Nassco. It did not urge that New York employ specific efforts, such as recruiting more draftsmen, promptly processing and mailing reproducibles and submit-

ting plans free of excessive errors and checked for interferences.

The FMB did not address itself at all to the cause of the delay, the higher priority work, and even avoided the subject. It accepted the delays in plans as inevitable consequences of the different construction schedules of the two yards; its solution was to recommend that Nassco postpone construction, without concern for the consequences to Nassco. It made no protest of New York's excessive errors, alterations and interferences, constant causes of delay, and surrendered to New York its duty to control the movement and mailing of the plans and did not retake it when it was poorly performed.

*The Higher Priority Work on the Savannah.* The primary failure of the FMB to "persuade, exhort, assist" centered about New York Ship's work on the Nuclear Ship Savannah—the only explanation ever given by New York for the delays in the plans.

The higher priority work in New York's yard actually involved several ships under construction for the government, among them the NS Savannah, the carrier Kitty Hawk, a submarine and guided-missile vessels, all presumably having priority over the cargo vessels and all in need of plans. The amount of work on these other ships—described by a New York representative in May of 1960 as an "overload"—was of course known in advance. Indeed, this other work played a large part in the precontract discussions of scheduling, and was the cause of New York's postponement to December 1958, of the beginning of construction of its two cargo vessels, awarded in February, 1958. Surely, then, when the contracts were in negotiation and being signed, it was foreseeable that the load of priority work would make such demands on New York's plan-producing abilities as might delay the plans for the cargo vessels.

Remarkably, the hearing board made Nassco responsible for the foreseeability of the delay, adding the foreseeability to the grounds for its conclusion that Nassco assumed the risk of delay.[17] Nassco doubtless knew, as did the public, that the Savannah and other ships were under construction by New York. But Nassco could not be expected to know the capacity of New York's drawing rooms to produce the working plans needed for a nuclear ship and for the cargo vessels, or how much New York might expand its staff to meet the demands of its workload. Such matters were the business of the FMB, which awarded the contract for plans and the cargo vessels to New York, and was intimately concerned with the Savannah and the other ships. Hoffman, Watson and Czudak were on behalf of their agency in one degree or another engaged in expedition of the Savannah and the other priority ships.

The officers of the FMB did not have the right to interfere with any lawful priority of these other ships or to fail to perform their duty to expedite the Savannah and the ships for the Navy. Other duties, however, could not excuse their less than full performance of the contract duty of all reasonable effort to supply Nassco with the plans for the cargo vessels on time. Any conflict of

17. The opinion states that New York was "heavily engaged in other construction which foreseeably would delay work on the plans;" that "this fact should have been well-known to Nassco which dealt directly with New York Ship" in negotiating the agreement for the purchase of the blueprints; that these negotiations "clearly placed" Nassco "on notice of the precariousness of the undertaking with respect to time of production by New York Ship of the working plans."

In the course of the negotiations, a draft letter agreement submitted by New York Ship to Nassco would have released New York from liability with respect to "all" plans. Nassco's lawyer struck "all" and substituted "such," thereby properly confining the release to claims arising from the blueprints alone, the subject of the agreement. The word "all" was an overstatement which could have been made by any draftsman intent on the objective of releasing his client from all liability arising from the plans being sold. The incident cannot be said to have given notice of delays in approved plans, precariousness or other future event.

interest was theirs to resolve.[18] Their duty under the contract with Nassco required that they foresee, and having foreseen take steps to forestall, the delays from the higher priority overload in New York's yard. While the burden of proof is, as always, on the plaintiff claiming a breach, the evidence is such as to require a showing by the defendant that such efforts were made. No showing is made, and it must be taken that the efforts were not made.

The duty to act continued, as the delays set in and continued. The FMB seems not to have asked what were the causes of the delays, from July 1958, when they first came to its attention, to October of 1958. In that month New York, through its vice president, Sandberg, first offered the excuse of higher priority work in connection with the piping plans. The excuse was coupled with promises or expectations that the president of New York would reform the piping drafting section within a month. The FMB expediters did not thereafter raise the subject, though November and the succeeding months passed without piping plans, reform in New York's engineering capacities or production according to the plan schedules.

In March of 1959, Sandberg again gave the excuse of higher priority work, this time in a much larger context, as justification for a "revision" amounting to an abandonment of the contract plan schedules. Though the expediters asked, he refused to put in writing that the cause of the "revision" was beyond New York's control. In these circumstances, the acceptance of the excuse without question or protest was a breach of the FMB's duty to make an independent judgment on whether the claimed obstacle to production was beyond New York's ability to overcome or mitigate.

Performance of the contract duty required, even had Sandberg given them the writing they asked for, that they direct searching questions into the unavoidable effects and the likely duration of the higher priority work; that they consider and examine with New York and if necessary with their superiors the practicability of every available means of minimizing the delaying effect of the priority work. In a word, their duty required that they "persuade, exhort, assist," and they did not perform it.

No argument is made on behalf of defendant in this case that the delay from the higher priority work was beyond New York's ability to control or alleviate, and none could be made, in view of the FMB's failure to question Sandberg's refusal to go on record or even to suggest to New York that it take steps to increase its drafting resources. No credible reason suggests itself why the plans could not have been speeded up by better scheduling,[19] overtime work,[20] additional draftsmen, the

---

18. Compare Peter Kiewit Sons' Co. v. United States, 151 F.Supp. 726, 731, 138 Ct.Cl. 668, 675 (1957), in which it was held that the government may not satisfy its own priorities, in regard to its other procurement needs, to the sacrifice of its obligations to perform an obligation to furnish a contractor in timely fashion the materials needed by him.

19. Schlosser said that New York's engineering manpower "fluctuated abruptly" "due to pressure being brought on the NYS drawing room [by?] demands from other contracts of a greater magnitude and importance, such as the CVA 63—Kitty Hawk—N.S. Savannah—guided missile vessels, as well as other U. S. Navy work."

20. In F. H. McGraw & Co. v. United States, 82 F.Supp. 338, 113 Ct.Cl. 29, 38 (1949), plaintiff was by contract required to complete the work by December 1, 1944, from drawings produced by the government's agent, a company called A–E–M. The court made the following finding of fact:

"19. Defendant's failure to furnish plaintiff with all the drawings to enable plaintiff to complete its Schedules A and B work before the ground froze, was due to the fact that the A–E–M drafting department was understaffed. The sixty men in this department were required to supply plans and drawings to the 26 contractors on the project. In order to have supplied plaintiff with its drawings by December 1, 1944, defendant would have

subcontracting of plans, or some other expedient known to experts in the field. Engineers were available for hire, as is shown by Nassco's recruitment of several to correct New York's interferences. Plans could be purchased; Nassco got a bid for a complete set of plans.

■ That the cause of delay was within some degree of control is confirmed by evidence indicating that the expediters did not believe that the higher priority work was as compelling as claimed. For one thing, after November of 1958, they took care in their internal memos not to endorse the validity of the excuse, by ascribing it to Sandberg. For another, they did not respond, in their letters of March 20, 1959, and April 12, 1960, to portions of letters from Nassco which had raised the question of New York's priority work in a manner calling for a reply. The FMB letter of March 20, 1959, is particularly revealing. In it, the FMB, by means of an unlikely reading of Nassco's letter as seeking a legal priority for the cargo vessels, avoided any response to Nassco's request that the FMB confirm for itself the delaying effect of New York's priority work, and take whatever steps were appropriate to prevent future such delays.[21]

The letter of March 20, 1959 was written in connection with the "revision" of the contract plan schedules. The only justification for such a departure from the contract documents was New York's claim of necessity by reason of the priority work. Acceptance by the FMB of the justification required an independent judgment, made after adequate inquiries. Yet the FMB in its letter omitted to disclose either the claimed justification or its acceptance without study or investigation, and despite New York's refusal to stand behind the purported justification in writing.

If the letter of March 20, 1959 were intended to solicit a waiver of the contractual quality of the plan schedules, it failed. No waiver is now claimed, and in view of the facts omitted from the letter none could be claimed.

The letter, with the other writings mentioned, confirms the total failure to employ any—much less all—effort and diligence in connection with the higher priority work. It follows that the contract was breached.

■ *The Duty To Go Elsewhere for the Plans.* The FMB was deficient in reasonable effort and diligence, too, in failing to consider a source of plans alternative or supplemental to New York Ship.

The obligation of effort and diligence by the FMB to supply the plans on the scheduled dates was under the contract unqualified. No clause made New York the exclusive source of plans. The FMB's procurement of the plans from New York by separate contract was merely a means for fulfillment of the obligation to Nassco. If New York should fail to produce the plans, the contract with Nassco would require the FMB to obtain the plans elsewhere.

So far the government concedes; it contends, however, that plaintiff does not say when the time arrived to go elsewhere and has presented no evidence showing that a change to another source would have resulted in a saving of time.[22]

had to work its draftsmen overtime or shift them from the work of other contractors. Defendant did neither of these things."

21. The failure to comply with Nassco's plain request to take action with respect to New York's priority work disposes of the claim of the FMB's witnesses that Nassco did not tell them what else to do to expedite the work.

It was not Nassco's duty to direct the FMB in the latter's work of expedition. Nassco reported delays promptly, called on the FMB to fulfill its duty of effort and diligence and employed Schlosser to act as expediter in the Spring of 1958, in Camden, sooner than the FMB appointed Watson to act as project expediter from Washington.

22. Another argument is that plans could not be gotten elsewhere because they are

It appears, however, that the FMB, unaware that its duty would include the replacement of New York when necessary, never considered the possibility of such replacement. Its officers apparently regarded as immutable the decision of their board to award the contract for plans to New York, and they erroneously read the contract with Nassco as binding Nassco to their sole dependence on New York for plans. According to their testimony, they did not at any time consider any other source for plans than New York or consider offering New York additional sums to produce the plans on time.

The hearing board seems to have been persuaded of their view of their obligation as one merely to obtain the plans from New York and deliver them to Nassco, a view now replaced by the government's concession that the FMB's duty to Nassco extended to finding another source of plans whenever it should become necessary.

The costs of another source were not necessarily a bar. New York's delays were costly to Nassco, too. Plans cost money, by whomever procured or drawn. Nassco had reduced its price to the government by $720,000, the amount of the bid it had received for a complete set of plans, in consideration of the FMB's dual undertaking to supply the plans and to employ effort and diligence to supply them on time. Nevertheless, it did not occur to the FMB's officers that "all" reasonable efforts to supply the plans on time might include the expenditure of sums in addition to the contract price payable to New York, or that New York's reasonable efforts, to which the FMB was entitled by contract, might include the assumption of costs of a supplemental or even an entirely new source for plans which New York was unable to produce on time.

The essence of the FMB's fault was not its failure to abandon New York at a particular time, but its failure despite all the delays even to begin to consider the question of another source. Nassco is therefore not called on to prove precisely when and to what extent and to accomplish what saving in time a duty arose to abandon New York and go elsewhere for plans. It was continuously apparent that New York was not meeting the contract plan schedules, and progressively more apparent that it would not catch up. Had the FMB recognized the reach of its duty, it might on consideration and on weighing the considerations—cost, relative speed and any others relevant—have resorted to another source in November or December of 1958, when promised improvement in plan deliveries failed to occur. If the time were not yet ripe for entire replacement of New York, a second source might have been enlisted for only the piping plans, "sorely needed" for so long. Or the FMB might have abandoned New York in March of 1959, when Nassco had received less than half of the scheduled plans and New York admitted that it could not meet the contract schedules, or in August of that year. Partial utilization of a second source might have made further supplementation of New York unnecessary.

The whole matter of a second or alternative source—cost, timing, type, extent of utilization and speed-up to be achieved —was for the FMB to consider and having considered to make a reasonable decision. Had the duty been recognized, even mention to New York that a second source was under consideration would doubtless have stirred it to make greater efforts and perhaps by hiring more engineers solve the problem. The constant delays and the abandonment of the contract plan schedules made mandatory the duty to begin the process of consider-

---

required to be developed during the period of construction through cooperation between the planning and construction departments of a shipyard. The argument is contradicted by the concession that there was a duty to go elsewhere for plans

when need arose, as well as by the very fact that the FMB-approved arrangement for the plans was that for almost a year they should be produced by New York, not yet in construction, for Nassco's use, in construction.

ation. The failure to perform the duty foreclosed a whole avenue of possible improvement over New York's performance, and constituted a breach of the contract's requirements.

██ *The FMB's Concern for Contract Delivery Dates and the Related Increase in Expedition Efforts.* The government argues that the fact that the plans were delivered in time to permit Nassco to complete and deliver its ships by contract delivery dates indicates that at no time was the delay sufficient to justify employment of independent naval architects to produce the plans. The argument would measure the duty to make reasonable efforts by Nassco's tolerance to the increased costs of late and out-of-sequence plans. Nassco had a wholly legitimate interest in the avoidance of increased costs by the delivery of the plans as needed for its construction schedule. The FMB showed insufficient regard for this interest during the contract period. The argument now made does likewise.

The FMB's underconcern for timely plan deliveries and for Nassco's construction schedule appears occasionally in the FMB's memos. Thus on November 20, 1958: New York is "primarily responsible" for preparation of plans and delivery of its vessels at contract delivery dates. And in the memo of August, 1959, when plan deliveries were so badly off: "the situation is not as critical as may appear," although Nassco's construction schedule may not be met, because the contract delivery date is "entirely feasible."

The indifference to Nassco's interest in supply of the plans on time appears most prominently, however, by the contrast between the efforts in 1958 and 1959 to bring about plan deliveries on time and the increased efforts in late 1959 and 1960 when accumulated delays in plan production endangered delivery of the ships at contract completion dates. The later efforts were vastly more diligent than those earlier employed.

In 1960 the expediters made frequent visits to New York's yard, criticized the staff of the FMB's Construction Representative at the yard for its absorption in the Savannah to the neglect of the cargo vessels, even criticized New York (albeit mildly) for its delays, cooperated closely with Nassco's agent, Schlosser, and reviewed the late plans, one by one, with the men in charge of New York's drafting. In the earlier period they had been content to talk to Sandberg, accept his excuse of higher priority work, blame the delays on Nassco's construction, speak sharply to Beattie in response to his repeated calls for expedition, and "request expedition."

The FMB gets no good marks for its latter-day increase in effort and diligence. It acted in pursuance of its own interest in delivery at contract dates, the damage to Nassco had been done, the contract plan schedules had been allowed to become hopelessly incapable of fulfillment. The increased efforts remained insufficient; at no time were efforts directed towards enlarging or supplementing New York's resources for producing plans.

Until its own interests were threatened, the FMB seems to have counted, successfully, on Nassco's ability to meet contract delivery dates by dint of compression of its construction schedule and by incurring of increased costs. The FMB's conduct showed just such a disregard of Nassco's interests as under the authorities cited in Part IV is held to be a failure to exercise reasonable effort and diligence.

*The Differing Construction Schedules and the "Total Contractual Arrangement."* The FMB expediters absolved themselves and New York of responsibility for effective efforts by repeatedly ascribing the delays to the differing construction schedules of the two yards, and criticizing Nassco for beginning construction sooner than New York. In so doing, they failed to appreciate that the differing schedules had from the outset contained such a potential for delay as required special effort and diligence on their part. Their failure of understanding and their misplacement of blame ex-

pressed a neglect of duty—toleration of delays in plan deliveries and failure to address themselves to its causes.

Both of New York's cargo vessels were by the contracts to be delivered before the first of Nassco's vessel; on a ship-for-ship basis, delivery by New York was due five months before Nassco's delivery. Nevertheless, Nassco scheduled its construction to start at the very beginning of the contract period, while New York's schedule began ten months later, in December 1958. Nassco planned to deliver its first ship approximately 30 months from the start of construction. New York would do it in approximately 20 months. The explanation for this marked difference in construction schedules for identical ships awarded in contracts signed on the same day lay in the relative size of the yards and in the volume of work in New York's yard.

New York, an established yard and much larger than Nassco, had a great deal of work in process at the time the contracts were signed. Nassco was a new yard with limited facilities, which although expanded for this job could not handle construction of the vessels in a short period. Because Nassco would begin construction immediately, the contract plan schedules called for the first working plans to be supplied beginning March 1958, within a month after the contract was executed on February 13. As Hoffman said, "Nassco being a smaller and newer Yard requires more plan lead time than New York Shipbuilding Corp."

All of this was well-known to the FMB. Hoffman, the contracting officer, was in charge of negotiation and administration of the contracts, including the performance of the duty of effort and diligence. The decision to procure the plans from New York was an FMB decision, and the FMB approved the construction schedules of both yards, as well as the identical plan schedules, geared to Nassco's construction schedule.

The original thinking of the FMB was that New York should contract with Nassco to furnish the plans directly to Nassco. Had this been done, New York might have been under a closer discipline in meeting with contract plan schedules. In any event, New York refused and would agree only to a contract to furnish working plans to the FMB. Accordingly, New York in one contract promised to exercise all reasonable effort and diligence to furnish the plans to the FMB on the scheduled dates, and in another contract the FMB promised to exercise the same effort to supply Nassco with the plans on the same dates.

Taken together, the different construction schedules, the plan schedules, Nassco's size, New York's other, immediate work, and the two contracts created an obvious potential for delay, even without the addition of any element of rivalry between the yards. New York, busy with other work which would make demands on its plan-drawing departments, and without need for any of the plans for almost a year after the scheduled dates, would draw the plans, free of obligation to guarantee delivery at the scheduled dates. To meet its construction schedule, Nassco would need timely receipt of plans being drawn on the other side of the country by draftsmen daily facing demands for other plans from in-house construction departments. Delays in deliveries of plans, so likely in the circumstances, would, without hurt to New York, force Nassco into condensation of construction into a shorter period than it could manage, at least without difficulties and increased costs. Nassco could depend only on performance by the FMB of its obligation to employ all reasonable effort and diligence to supply the plans on schedule, which in turn, meant disciplining New York into performance of *its* obligation of all reasonable effort and diligence.

In view of these considerations, when delays took place, the expediters were irrelevant and unrealistic in criticizing Nassco for bad practice in having failed to postpone the beginning of its construction until after New York began to build. They could with equal logic have blamed

New York for not paralleling its construction with Nassco's construction schedule. Nassco's construction schedule was for it a matter of necessity and had been, moreover, approved by their own agency. Above all, Nassco's construction schedule and its difference from New York's schedule was a fact, nobody's fault, part of the situation, contractual and otherwise, in which the expediters were put to work. In putting blame on the facts, the expediters were aiming at the very reason for their task, instead of its objective, timely plan deliveries. Their duty was to get plans delivered so as to preserve Nassco's construction schedule, not to attack it.

One error led them to another. Having explained the delay as they did, their solution was not to put pressure on New York to hasten plans, but to recommend that Nassco delay construction. On the first proffer by New York of its higher priority work as the excuse for delay in plans, instead of directing themselves to the cause of delay stated, the expediters began their criticism of the construction schedule, and recommended an increase in Nassco's facilities and a postponement of keel and launch dates of both vessels. When Nassco acceded and postponed the keel-laying of one vessel from November 1958 to March 1959, and then later laid the keel in January 1959, the expediter was critical. The longer postponement, he wrote in a status report of March 24, 1959, would have been "more in line" with plan deliveries and closer to New York's own date, plainly believed to be the ideal. The same memo implied that the shortening of the postponement explained or was the cause of the burdensome rework at Nassco's yard brought about by New York's alterations in approved drawings. Again, when Nassco complained to the expediter, on April 29, 1959, of wasted work caused by New York's alterations, he responded that the fault lay primarily with Nassco, for scheduling its keel and launch dates earlier than those of New York.

The assumption of the expediters was that Nassco should adjust its construc-

tion to New York's delays in plan deliveries—a contradiction of their mandate and a negation of the duty of the agency under the contract.

The hearing board repeated the error. In its opinion, it wrote that "Friction was inherent in the lead-yard-follow-yard relationship which persisted under the combined schedule of vessel completion dates;" that "Nassco's loss stemmed from circumstances surrounding the total contractual arrangement;" that Nassco "consciously chose to execute" its contract, "only one item of a three-part package open for public inspection which, in toto, placed Nassco in a subordinate position to New York Ship with respect to production and delivery of the working plans. By this act Nassco assumed the risk of delay."

The references to the lead-yard-follow-yard relationship and to the combined schedule of vessel completion dates are references to the differing construction schedules, already discussed above. The administrative opinion adds, to the data relied on by the expediters to put the blame on Nassco, that the contract between the FMB and New York was open to public inspection, that Nassco was therefore on notice of its contents and that Nassco thereby assumed the risk of delay.

Nassco's representatives did not see the FMB-New York contract before it was signed; the record shows only that had they asked to see it, it would have been shown to them, on the day when both the FMB's contracts wth New York and Nassco were signed in Washington. These facts are not enough to charge Nassco with notice of the contents of the FMB-New York contract.

The potential or risk of delay, moreover, was apparent to all. As assurance against the risk of delay, Nassco had the FMB's promise to employ all reasonable effort and diligence to avoid and reduce delay. The text of the FMB's contract with New York, had Nassco read it before it was signed, would only have confirmed to Nassco its dependence on per-

formance by the FMB of the contract obligation of effort and diligence.

Neither the differing construction schedules nor the "total contractual arrangement" in the least excused the FMB from its duty. To the contrary, the schedules and the contracts, by creating a situation in which delay was only too likely, heightened the need for effort and diligence.

*Rivalry Between the Two Yards.* Another circumstance affecting the FMB's duty to be on guard against remediable delays on the part of New York was the rivalry between New York and Nassco. New York, the hearing officer noted, was Nassco's "competitor," "nettled" at the award to Nassco of two of the four ships on which New York had submitted the low bid. He might have added that the award to Nassco and the accompanying subsidies to American Export were in part designed, in the interest of national defense, to assist Nassco to establish itself permanently.

Schlosser said that:

* * * NYS' Director of Engineering [Sandberg] repeatedly pointed out that he considered us competition and had no intention of helping us any more than required by the contract. There were, naturally, a few others who echoed this statement.

█ Any producer of plans might take a minimal view of the effort and diligence reasonably appropriate to produce working plans according to a schedule of sole benefit to a rival. The expediters, nevertheless, seem to have failed, as did the hearing officer, to consider that this possibility required special vigilance on the part of the expediters to insure that any ill-will by New York for Nassco was not a contributing cause of the delays. No signs of such vigilance are apparent in the record. As noted above, the expediters accepted at face value New York's promises of expedition and its excuses for delays.

*Delays from Errors.* Errors, alterations and interferences in New York's drawings were a cause of delays from the first plans furnished in 1958, to the last painful hold-ups in work in the Spring of 1960, awaiting the redrawing and resubmittal of disapproved drawings, final approval and last alterations. The FMB made insufficient efforts to overcome these delays, by failing to demand a reduction of their cause—excessive errors, alterations and interferences.

In October of 1958, Watson called to New York's attention the fact that the number of "comments" by the Henry Co. showed that incomplete plans were being submitted. The FMB expediters seem to have made no further protest to New York. Minor and unsuccessful attempts were made to persuade the Henry Co. to protest to New York. They failed and the matter was dropped, despite the continuing substantial work stoppages and rework caused by errors, alterations and interferences.

█ Under the contract, the FMB, as it reminded Nassco did not guarantee the accuracy of plans. It may not, therefore, be held liable for damages from errors as such. The cumulative total of the errors, however, was such as to suggest that New York was knowingly furnishing incomplete plans, intending to complete them at a later date, presumably before it would use them in its own construction. Whatever the cause—a shortage of engineering manpower, disregard for Nassco's interests or other—such conduct would be a lack of effort to comply with the contract plan schedules, and warranted the strongest protests. The failure to make such protests was a breach of the FMB's duty of effort and diligence to supply the plans in time under the standard set by the authorities cited in Part IV.

█ *Neglect of Administration.* Finally, the FMB failed to employ reasonable effort and diligence in the administration of the movement of the plans and their transmission to Nassco.

The job required controls, over two years, of the distribution of 650 plans, plus uncounted resubmissions and alterations, from first submission to final de-

livery to Nassco. Plans in various editions would move constantly, as they would be submitted, disapproved, amended and resubmitted, between the Henry Co., the FMB and other agencies, and then be processed into reproducible form and mailed to the FMB for Nassco. Each alteration would repeat the cycle. The FMB's duty included the provision of assurance that reliable controls would be maintained over the movement of the volume of plans. Though the controls left much to be desired, the FMB took no steps to reform them.

Various irregularities with respect to the recording and mailing of plans in 1959 and 1960 are collected in Part V, Section 6. Plans were produced and not mailed. Plans were said to be mailed and not mailed until much later. As early as July of 1958, it had appeared that the very first plans had been ready for some time and had not been transmitted for lack of a reply from the FMB to an inquiry as to the type of reproducibles desired. The ready plans were then said by New York to have been mailed on one day and were in fact mailed days later. At another time New York advised that it had submitted various plans for approval to the Henry Co. on stated days; the Henry Co. advised that five and in another case six days later the plans had not yet been submitted. Some plans were never mailed until large-scale checks were made in 1960; no routine check had assured that approved plans were mailed. All of this variety of mistakes indicated bad management, and all caused delays.

Processing of plans was slow. The first such episode appeared on August 4, 1958 when only 11 of 41 approved plans had been processed and mailed. When a complaint was made in September 1959, 11 reproducibles of 20 delayed alterations could be sent in one day. Schlosser said that it took two weeks for an issued plan to get to Nassco. Plans were not procedurally correct; some arrived without indication of approval by the required agencies. For a time, at least, plans came in the form of reproducibles though the Henry Co. had made comments which required revisions to be made. Some plans sent were of poor quality and would not reproduce.

Records of plans were contradictory and confusing. Plans called for urgently were listed as sent long before. Plans were cancelled or deleted from the schedule without advice to Nassco. Alterations known to one were unknown to another. In March of 1960, it appeared that substantial numbers of first issues of plans, as well as 148 alterations, were not known to the FMB, keeping the records in Washington. Once Nassco complained about an alteration N; the latest alteration known at the FMB was K. Schlosser said that "list after list" of plans "was sent back and forth." "Everything had to be checked and double checked."

The transmission of plans and alterations from New York to Nassco through the FMB undoubtedly contributed to the confusion and thus to the delays. Though the FMB was aware of the desirability of direct relationships between New York and Nassco, it permitted New York to make indirect transmission of plans to Nassco. It might reasonably have insisted that on its behalf and in the interest of expedition, the plans be transmitted directly. It is noteworthy that when matters were most urgent, in 1960, New York reversed its insistent practice and for a time sent plans directly to Nassco, failing even to advise the FMB.

Comprehensive and careful controls of the movement of the plans should properly have been exercised from New York's yard, by one or more men with sufficient authority for the job. Only representatives of the FMB would have that authority, yet the FMB did its expediting from Washington. The staff of its Construction Representative at Camden, the ideal choice for the job, was too absorbed in work on the Savannah. Watson's criticisms of the activity of the FMB's staff at Camden were warranted; whether the fault was that of FMB Washington or its office at the yard is

not material. While Beattie was calling urgently for working plans in almost every monthly narrative report from San Diego, his opposite number in Camden was substantially inactive for the first year or more, though the real work of expedition could be done only at Camden.

The breach was in part filled by Schlosser, Nassco's agent, who served as de facto expediter at Camden, doing the FMB's work. While Watson made occasional visits from Washington, Schlosser maintained close, informal contact with the engineering departments in charge of the drafting. The part played by Schlosser in Watson's reports in 1960 confirms the FMB's failure to do the job necessary to be done at the yard. With the FMB Construction Representative occupied elsewhere, and increased efforts necessary to be made because of the likelihood of late delivery of the ships, Watson came to rely on Schlosser for information and judgment which would have come better from an FMB representative at the yard with official status.

Schlosser could not do the job with full effectiveness for lack of sufficient status; he was limited by New York to the role of an observer only. Watson expressed satisfaction with such small favors as New York's invitation to Schlosser to attend a conference at Camden on the resolution of an interference between head-room and ceiling height. Instead, the FMB should have insisted to New York at the outset that Schlosser was acting in the interest of the FMB, and should therefore be accorded appropriate status. The FMB was more broadly at fault in not maintaining its own representatives at New York's yard to do a complete job of administering the movement of plans and of expediting their production.

## VII

In conclusion, the decision of the Maritime Subsidy Board that it was without jurisdiction to grant any relief on plaintiff's claim was correct, and there is merit in plaintiff's claim that the Federal Maritime Board breached its contract with plaintiff by failure to employ all reasonable effort and reasonable diligence to supply working plans to plaintiff on the dates in the plan schedules attached to the contract.

## CONCLUSION

Plaintiff's motion for partial summary judgment is granted, on liability alone, defendant's cross-motion is denial and proceedings on damages and on any remaining issues will continue after an interval to afford the parties the opportunity to reach agreement, pursuant to the provisions of Rule 131(c).

## APPENDIX

### EXCERPTS OF CONTRACT BETWEEN PLAINTIFF AND THE FEDERAL MARITIME BOARD

### CONTRACT NO. FMB–66

### CONTRACT FOR THE CONSTRUCTION OF TWO SINGLE SCREW CARGO VESSELS MA DESIGN C3–S–38a FOR AMERICAN EXPORT LINES, INC.

THIS CONTRACT entered into as of the 13th day of February, 1958 by and between the UNITED STATES OF AMERICA, represented by the FEDERAL MARITIME BOARD (hereinafter called the "Board"), AMERICAN EXPORT LINES, INC., a corporation organized under the laws of the State of New York (hereinafter called the "Owner") and NATIONAL STEEL AND SHIPBUILDING CORPORATION, a corporation organized under the laws of the State of California (hereinafter called the "Contractor").

\* \* \* \* \* \*

### SPECIAL PROVISIONS

ARTICLE I. *General Statement of Work.*

(a) The Contractor shall furnish all labor and material and shall perform all work necessary to construct, build, complete and deliver, at its own risk and expense, two Single Screw Cargo Vessels MA Design C3–S–38a (herein called the

"Vessel"), in strict accordance with the Plans and Specifications referred to in Article II hereof, and will do everything required of the Contractor by this contract (these Special Provisions and the General Provisions attached hereto and made a part hereof, and the Plans and Specifications), including the installation of any outfitting and equipment which the Plans and Specifications provide shall be furnished by the Owner and including the development of working plans, (with the Contractor receiving from the Board reproducibles of all working plans, purchase specifications and purchase orders including corrections and amendments, not warranted or guaranteed by the Board or the Owner as to completeness or accuracy), all for the consideration of twenty three million, five hundred nine thousand and two dollars ($23,509,002) (herein called the "Contract Price" together with such additions and subject to such deductions as are herein provided.

\* \* \* \* \* \*

## GENERAL PROVISIONS

\* \* \* \* \* \*

ARTICLE 2. *Definitions.*—As used throughout this contract the following terms shall have the meanings set forth below:

(a) The term "Board" means the Federal Maritime Board.

\* \* \* \* \* \*

(g) The term "material" includes but is not limited to any raw, in process or manufactured machinery, equipment, component, accessory, part, assembly or product of any kind which will be a direct material cost charge to the contract work.

\* \* \* \* \* \*

ARTICLE 5. *Extension of Time.*— (a) In case of any delay caused by the Owner or by the Board, or by any other agency or instrumentality of the United States or in the case of the occurrence of any cause of delay beyond the control of the Contractor, including without limitation, non-delivery or late delivery of material (but only if as determined by

the Board, the Contractor has used reasonable efforts to obtain said material for the time required in the performance of the contract work), Government priorities or intervention by or delays caused by civil, naval, or military authorities, acts of God (other than ordinary storms or inclement weather conditions), earthquakes, explosions, lightning, flood, or fire, strikes, or other industrial disturbances, riots, insurrections, or war, sabotage, vandalism, blockades, embargoes, epidemics, or delays of subcontractors due but not limited to such enumerated causes, written notice thereof and of the anticipated effect thereof, when knowledge thereof has come to the Contractor, shall be given promptly by the Contractor to the Owner. Within twenty (20) days (or such longer period as the Owner may allow) after such cause of delay has ceased to exist, the Contractor shall furnish to the Owner a statement of the actual delay resulting from such cause. The Owner shall submit the Contractor's statement to the Board together with any information and comments it deems relevant for the Board's use in determining whether such delays were caused by the Owner, by the Board or by cause beyond the control of the Contractor.

(b) On the basis of the statements and information furnished to the Owner by the Contractor, which the Owner shall transmit to the Board, in regard to change in delivery as provided in paragraph (a) of Article 4 of these General Provisions and as provided in paragraph (a) of this Article 5, and on the basis of such other evidence as the Board shall deem relevant, the Board shall determine the number of days that the date provided in the Special Provisions for the delivery date of the Vessel shall be advanced or extended by reason of a change in Plans and Specifications or caused by the Owner, the Board or by an agency or instrumentality of the United States, or resulting from a cause beyond the control of the Contractor.

(c) The determination of any and all extensions of time for delivery of the Vessel provided for in paragraph (b) of

this Article 5 shall be postponed, without prejudice to the rights of the Contractor or the Owner, until the Vessel has been delivered.

\* \* \* \* \* \*

ARTICLE 7. *Receipt for and Care of Items of Material Furnished by the Owner.*—(a) The Owner and the Board reserve the right to furnish to the Contractor items of material required for the contract work on the Vessel which pursuant to the Special Provisions or the Plans and Specifications are to be furnished by the Contractor, in which event the Contract Price shall be adjusted pursuant to the provisions of Article 4 of these General Provisions (and in the event the Contract Price is subject to adjustment for changes in labor and material indices (escalation) appropriate revisions shall be made in the quarterly material quotas set out in the Special Provisions).

(b) The Contractor shall, as a part of the contract work, at its own risk, receive, inspect, check, store, protect, insure and install aboard the Vessel all of the items of material to be furnished to the Contractor by the Owner pursuant to the Plans and Specifications or the Special Provisions, or paragraph (a) of this Article 7.

(c) Should the Owner, with the approval of the Board, direct the Contractor to receive, inspect, check, store, protect, insure, or install additional items of material furnished to the Contractor by the Owner, or by the Board, which are in excess of the items to be furnished by the Owner to the Contractor pursuant to the Plans and Specifications or the Special Provisions, the cost of the services performed in connection with such additional items of material shall be treated as a change pursuant to Article 4 of these General Provisions.

(d) If the Owner, as approved by the Board, so directs, all or any of the items of material to be furnished by the Owner pursuant to the Plans and Specifications or the Special Provisions shall be furnished by the Contractor and the furnishing of such items of material shall be treated as a change pursuant to Article 4 of these General Provisions. The Owner and the Board shall pay to the Contractor the costs of the Contractor, as determined by the Board resulting from delay in delivery of such item of material, furnished by the Owner or the Board beyond the time the Contractor would have secured the delivery of said item to the shipyard if it had been furnished by the Contractor, provided, however, in determining such delay in furnishing such item of material the Owner or the Board shall be entitled to an extension of delivery time for the causes of delay provided in Article 5 of these general provisions. In connection with the determination of the Board referred to herein, the Owner may submit comments and information in regard to Contractor's claim which shall be considered by the Board.

\* \* \* \* \* \*

ARTICLE 35. DISPUTES.—Any dispute concerning a question of fact arising under this contract which is not disposed of by agreement of the parties to this contract, shall be decided by the Chief, Office of Ship Construction and Repair of the Maritime Administration, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Contractor and to the Owner, which decision shall be final and conclusive and shall bind all parties to this contract, unless within thirty (30) days from the date of receipt of such copy the Contractor or the Owner appeals from said decision by mailing or otherwise furnishing said Chief, Office of Ship Construction and Repair, a written appeal addressed to the Board. The decision of the Board unless determined by a court of competent jurisdiction to have been fraudulent, capricious, or arbitrary, or so grossly erroneous as necessarily to imply bad faith or is not supported by substantial evidence, shall be final and conclusive and shall bind all the parties to this contract. In connection with any appeal proceeding under this Article 35, the Contractor and the Owner shall be afforded an opportunity to be heard

before the Board or before the duly authorized representative or representatives of the Board appointed for the hearing of said appeal and an opportunity to offer evidence in support of or in opposition to the appeal. Pending final decision of a dispute hereunder, the Contractor shall proceed diligently with the performance of the contract work and in accordance with the decision of said Chief, Office of Ship Construction and Repair. The fact that the Owner, with or without comment, refers to the Board as hereinbefore provided, the Contractor's estimates as to the cost and time of making changes, shall not prejudice the rights of any party to have any dispute relating thereto decided under this Article 35.

\* \* \* \* \* \*

ADDENDUM NO. 3 TO SPECIFICATIONS FOR AMERICAN EXPORT LINES, INC., SINGLE SCREW CARGO VESSEL DESIGN PR–1968– MARITIME ADMINISTRATION DESIGN C3–S–38A–20 AUGUST 1957

The specifications shall be modified as follows:

Page 1–5, Article 8—After the first paragraph, insert the following:

The Owner and the Board shall furnish approved reproducibles of (1) complete working plans, (2) complete purchase specifications, and (3) complete purchase orders.

The Contractor shall construct, outfit and equip the vessels under his contract in accordance with the plans, purchase specifications and purchase orders furnished to him, which data, however will not be guaranteed nor warranted by the Owner nor the Board as to completeness nor accuracy. It shall be the obligation of the Contractor to assure itself that all plans, schedules, requisitions, bills of material and other data upon which construction is predicated which is received from the Owner and the Board are correct and to promptly bring to the attention of the Owner and the Board any errors and omissions or features thereof considered by it to be in excess of contract requirements. In the event that any of said plans, schedules, requisitions, bills of material or other data are considered by the Contractor to be unsuitable to its own production processes and equipment, or where items of manufacture other than those shown on plans furnished to the Contractor are furnished by the Owner and the Board pursuant to the provisions of the contract or are otherwise required, the Contractor shall submit to the Owner and the Board copies of the Contractor's revised plans, details, sketches or miscellaneous installation plans suitable for the purpose. Such copies shall be submitted (in such numbers as may be required) to the Owner and the Board for action and the Owner and the Board shall promptly take appropriate action. No work thereunder shall be commenced by the Contractor until such revised plans, details, sketches and installation plans are approved by the Owner and the Board.

At least the following materials, including drivers, essential controls and spare parts, as directed, shall be duplicates of those furnished by the New York Shipbuilding Corp., under a separate contract for the same owner:

Hatch Covers, Q.A.

Fixed $CO_2$ Detection and
　Extinguishing
Lifeboats and Davits
Laundry Washers and
　Dryers

Main Turbines and Gears, including Maneuvering
　Valves
Main Shafting
Propeller
Main Condenser

Auxiliary Condensers

Main Air Ejectors
Aux. Air Ejectors
Oland Leak-off Exhausts and
　Condenser

Distilling Plant
Contaminated Water
　Evaporating Plant

Fuel Oil Heaters

L. O. Coolers

L. O. Purifier

L. O. Heater

First Stage Feed Heater
and Drain Cooler

Deaerating Heater

Boilers, Soot Blowers and Oil
Burners

Echo Depth Sounder

Radar

Radio Direction Finder

Gyro Compass and Repeaters

Automatic Steering Control

Forced Draft Blowers

Boiler Air Heaters

Ventilation Fans

Air Conditioning Machinery

Cargo Dehumidification
Machinery

Refrigeration Machinery

Air Compressors

Pumps, Motor and Turbine
Driven

Emergency Diesel
Generator

Turbo-generators

Steering Gear

Anchor Windlass

Capstans

Cargo Winches

Topping and Vang Winches

Motor Generators

Main Switchboard

Emergency Switchboard

Lighting Fixtures in
Quarters

Test Panel

Steering Gear Transfer
Panel

Main Radio

Engineer's Alarm Panel

Engineer's Signal Panel

Regulating Valves

All Main Steam Valves

China Plumbing Fixtures

Mechanical Galley
Equipment

Page 1–5, Article 8—At end, add:

The Federal Maritime Board shall employ all reasonable effort and reasonable diligence to supply to the Contractor working plans on the dates set forth in the Plan Schedules entitled "Design C3–S–38a Plan Schedules—Hull—Machinery—Electrical, 2 January 1958" which form a part hereof.